UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JIMMY S.C. JINN, | : | CIVIL ACTION NO.: |
| Plaintiff, | : | |
| v. | : | |
| SIG SAUER, INC. | : | JURY TRIAL DEMANDED |
| Defendant. | : | FEBRUARY 10, 2020 |

## COMPLAINT

Plaintiff Jimmy S. C. Jinn, by counsel and for his Complaint seeking judgment against defendant SIG Sauer, Inc. ("SIG"), alleges as follows:

## SUMMARY AND NATURE OF ACTION

This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to defendant Sig Sauer, Inc.'s negligence and defective design of a semi-automatic firearm. Specifically, a striker-fired, semi-automatic gun known as the "P320" that has fired on law enforcement agents and civilians across the nation over the last four years, without the trigger being pulled.

Jinn, a Homeland Security Investigations Special Agent, is a 24-year law enforcement veteran with substantial firearms experience. At the time his P320 discharged on July 24, 2019, he was conducting tactical shooting during a qualification course at the

Rodman's Neck range.

As Jinn placed his hand on the weapon's grip while holstered to begin the draw process, it fired one round through his holster into his right leg.  It entered his right thigh, tunneled through it to his knee, and finally exited his calf.  He never pulled the trigger at any time during the initiation of the draw process.

He was taken to Jacobi Medical Center where he underwent emergency fasciotomies for limb salvage and hemorrhage control.  Thereafter he developed numbness and paresthesia of his lower right leg.  He further developed tibial vein deep vein thrombosis putting him at risk for a pulmonary embolism and death, and was required to take blood thinners and painkillers for many months.  He continues to suffer lower leg numbness and pain in his posterior thigh whenever he is required to stand or sit at length, and can no longer run or function the way he had been before the incident.

Jinn's P320 should not have discharged without the trigger being pulled.  In its "Safety Without Compromise" marketing materials for the P320, SIG states:

> We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Despite this express representation, which SIG has made for the last several years to the present, the weapon fired without the trigger being pulled.

Jinn brings causes of action under New York law for negligence, strict products liability, breach of express warranty, breach of implied warranty, and negligent and intentional infliction of emotional distress in view of Sig's misrepresentations about the safety of the weapon.  Defendant SIG, moreover, had knowledge, as early as February

2016, if not long before, that the P320, its first striker-fired pistol, was capable of firing

by itself without the trigger being pulled due to a defective firing assembly inside the gun.

For many years since the weapon was first introduced to the market in 2014, SIG

has recklessly failed to recall it despite knowing of many grievous wounds it has inflicted

on law enforcement agents and civilians across the country.

## JURISDICTION

1.      Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. §

1332.  Plaintiff Jinn is a citizen of the United States and the State of New York.  Defendant

Sig Sauer, Inc. has a principal place of business in New Hampshire and, accordingly, is a

citizen of New Hampshire.  The amount in controversy substantially exceeds, exclusive of

interest and costs, $75,000.

## VENUE

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and

(c)(2).  The discharge at issue occurred in the Bronx on July 24, 2019.  Defendant SIG does

business in and is subject to personal jurisdiction in this judicial district.

## PARTIES

3.      Jinn is a 49-year-old Homeland Security Investigations Special Agent who

on July 24, 2019 suffered severe, permanent physical injury as a direct and proximate result

of the negligence and breach of warranties and deceptive marketing practices of SIG.

4.      SIG Sauer, Inc. ("SIG") designs and manufactures firearms and rifles for

military and commercial markets in New York, throughout the United States, and

internationally. It manufacturers its products in the United States, and markets and sells

them directly and through dealers. SIG Sauer, Inc. was formerly known as SIGARMS, Inc.

and changed its name to SIG Sauer, Inc. in October 2007. It no longer has any affiliation

with its former German supplier, SIG Sauer GmbH, which now distributes German-

manufactured SIG-branded firearms through a different distributor, Legacy Sports

International.

5.      SIG was founded in 1985 and has its principal place of business in

Exeter, New Hampshire.  Its Chief Executive Officer at all times relevant to this Complaint

was Ron J. Cohen.

**ALLEGATIONS**

6.      The incident occurred on July 24, 2019, while Jinn was engaged in tactical

shooting during a qualification course at the Rodman's Hollow range in the Bronx.

7.      The round discharged from the weapon without the trigger pulled, while  Jinn

was in the process of drawing the weapon from its holster.

8.      While the weapon was securely holstered, Jinn placed his right hand on the

weapon's grip, to begin the draw process.  The gun then fired one round through the

opening of his holster into his right leg.  The round moving at approximately 1700 mph

perforated and tunneled through Jinn's thigh, tunneled further downward behind his knee,

and exited his calf.

9.      He was rushed to Jacobi Medical Center in the Bronx where he underwent

emergency fasciotomies for limb salvage and hemorrhage control.

10.     Thereafter, JInn developed numbness and paresthesia of his lower right leg.

11.     He further developed tibial vein deep vein thrombosis putting him at risk for a pulmonary embolism and death, and was required to take blood thinners and painkillers for many months.

12.     Jinn continues to suffer lower leg numbness and pain in his posterior thigh whenever he stands or sits for a  length of time, and can no longer run or function the way he had before the incident.

13.     While the full extent of the physical damage to his leg is not yet known, it is likely that he will have trouble running, sitting or standing as he had before the discharge, and may not be able to return to his position as a result of diminished physical capacity to perform his job.

14.     The incident has resulted in substantial physical harm and related trauma to Jinn, 49, who has received substantial and ongoing pain-killing narcotics on a day-to-day basis to deal with the injury and loss of function..

15.     Years before the incident occurred, through and including the date of the incident, SIG expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



SAFETY WITHOUT
COMPROMISE

We've designed safety elements into every necessary feature
on this pistol. From the trigger, to the striker and even the
magazine, the P320 won't fire unless you want it to.

16.     In additional marketing material, under the heading "Striker Safety,"
defendant SIG SAUER further states that the striker safety "[p]revents the striker from being
released unless the trigger is pulled."

17.     At the same time, SIG SAUER contradictorily stated in the original owner's
manual for the P320, on page 25, that the weapon could fire if dropped without the trigger
being pulled if a round were "chambered" i.e., inside the firing chamber of the weapon's
slide.

18.     It is standard operating procedure for all U.S. law enforcement agencies,
including the United States Secret Service, the Federal Bureau of Investigation, local
police departments, and the military, at a commander's discretion, to carry pistols with a

chambered round.

    18.    The  P320 is the first striker-fired pistol[1] SIG has manufactured.  It assembled

it using the same frame from an earlier hammer-fired SIG model, the P250.

    19.    While competing for a $580,000,000 contract to supply the United States

Army with a new service pistol in 2016, SIG's prototype P320s exhibited nearly 200

malfunctions during Army testing.  The Army demanded that SIG fix all problems associated

with the prototypes.

---

[1]    A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather an internal "striker" that is held back under spring pressure inside the gun, very much like a bow and arrow. Once the slide is forcibly moved or "racked" backward, the weapon is pre-cocked, as the striker is then under significant spring tension and ready to move forward to impact the round's primer to fire the bullet.  The striker is held back the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol; the striker in red is held back by the sear in blue.



20.     On May 10, 2017, after SIG was awarded the contract, the United States
Army submitted an urgent Engineering Change Proposal for the prototype P320.  The
document essentially demanded that SIG change its entire internal firing assembly.  SIG
complied and made all requested changes to the Army version of the weapon.

21.     However, it left approximately 500,000 P320s to be used by United States
law enforcement and civilians in their original condition..

22.     Sometime after January 2017, when a Connecticut law enforcement agent
was shot by a P320 when it fell to the ground from less than three feet, SIG removed the
warning on page 25 from the user manual regarding a chambered round, and replaced it
with the following language:

 All SIG SAUER pistols incorporate effective mechanical
safeties to ensure they only fire when the trigger is pressed.
However, like any mechanical device, exposure to acute
conditions (e.g. shock, vibration, heavy or repeated drops)
may have a negative effect on these safety mechanisms
and cause them to fail to work as designed. After suspected
exposure to these conditions, have the firearm checked by
a certified armorer before using. Mechanical safeties are
designed to augment, and not replace safe handling practices.**Careless and improper
handling of any firearm can result in unintentional discharge.**

(emphasis in original).

23.     SIG had never before represented that mere "vibration" could cause the
weapon to discharge.  Upon information and belief, no other firearms manufacturer has ever
made such a representation.

24.     In a 2016 amendment to the user manual, moreover, SIG warned users not to lubricate the striker inside the gun, a normal part of the process of the cleaning and maintenance of any semi-automatic firearm.  The striker, as noted, is held back while under spring pressure by and rests, in the P320, in tenuous contact with a small piece of metal inside the gun called the weapon's sear.

25.     SIG has also expressly represented, since the P320's manufacture and distribution into the stream of commerce, that the weapon possessed a "robust safety system":



26.     The SIG P320 was originally designed and manufactured in or about 2014, or

earlier.  The original design and manufacture of the P320 rendered the weapon

unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents

involving its intended uses, including any normal carrying, holstering, un-holstering, or

rough handling in any altercation or combat, including at the time SIG sold the P320 to Jinn's HSI Department in 2018.

27.     Specifically, the p320 possessed an inadequate sear-striker connection, even after implementing a "voluntary upgrade" program for the gun in 2017, an inadequate internal striker safety, and lacked any external safety or tabbed trigger safety.

28.     In 2018, SIG shipped approximately 9,000 P320s to the Department of Homeland Security, and thousands of others across the country.  At that time, it knew, or should have known, that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

29.     Before it shipped these weapons, SIG was aware of defective, un-commanded discharges of the P320, and other SIG pistols, many of which pre-dated the 2018 sale to the Homeland Security Department.

30.     Upon information and belief, there have been many prior incidents of unintended discharges involving SIG weapons, both hammer and striker-fired, that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, handled, or while being holstered.

31.     For example, from 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges at a time when it issued SIG Sauers as its primary sidearm.

32.     In 2002, a San Fernando police officer dropped his SIG Sauer, causing an accidental discharge that killed him, an incident directly at odds with claims that a trigger must be pulled to fire a gun.

33.     In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

34.     In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

35..    In 2012, a New York transit officer accidentally discharged his SIG Sauer while holstering it.

36.     In 2014, a federal air marshal in New Jersey unintentionally shot himself while handling his SIG Sauer service weapon.

37.     In 2015, a Pennsylvania state trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

38.     In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

39.     In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

40.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer moved to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video and shows that no object entered inside his holster at any time.

41.     In 2016, the Surprise, Arizona, police department complained to SIG of two

13

separate incidents of P320s firing without trigger pulls.

42.     These latter three incidents were not disclosed by SIG in two separate federal civil actions, despite long outstanding discovery requests, until the last day of discovery in the second proceeding in early 2019.

43.     In October 2016, a P320 fired un-commanded on retired NYPD officer Thomas Frankenberry in South Carolina, severely injuring him.  The spent casing did not eject.

44.     In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

45.     In 2017, a sheriff's deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

46.     On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, an incident directly at odds with SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull, and does not require a safety to be drop safe.

47.     On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

48.     On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

49.     On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ, Police Department.

50.     In June of 2017, SIG shipped approximately 800 P320s to the Loudoun

County Sheriff's Department, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[2]

51.     On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

52.     On August 4, 2017, the Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 that shot him in his knee.

53.     Four days later, SIG's CEO released a statement stating:  "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

54.     This statement was false, in view of SIG's knowledge that Officer Sheperis in Connecticut had been shot some eight months earlier with the commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

55.     On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

56.     This statement was also false, as there are no federal government standards for gun safety, a fact known to SIG when it issued this press release.

57.     No federal agency oversees how firearms are designed or built.   Firearms were expressly exempted by Congress from any federal regulation when it created the

---

[2]      As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

Consumer Product Safety Commission in 1972.

58.     SIG's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing non-military, commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, and an improved sear to prevent accidental discharges.

59.     On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

60.     In October 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect.  His weapon was holstered and fired simply when he struck the ground.

61.     On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

62.     In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

63.     On February 7, 2018, Loudoun County, Virginia, deputy sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries and related trauma, ending her career.

64.     Upon CAT scanning the weapon, it was found that her P320 had both a design and a manufacturing defect:  specifically, crossed and tangled sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

65.     In a civil action relating to the Vadnais incident filed in the United States District Court for the Eastern District of Virginia, defendant SIG filed two motions to preclude Vadnais's weapons experts from testifying.   The court denied both Motions in March 2019.

66.     In April 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

67.     In May 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

68.     In June 2018, a Williams County, Ohio, officer reported that his P320 discharged twice in one moment as he was attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver's side door.

69.     In May 2018, a Rancho Cucamonga, California, officer reported that his P320 fired un-commanded while he was walking inside his department locker room.  The casing of the spent round did not eject.

70.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

71.     In October 2018, firearms expert and retired law enforcement officer Stephen Mayes' P320 fired on him un-commanded while seated in its holster, causing severe injury to his right leg.

72.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded,

causing severe tunneling wounds to his right leg.

73.     On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square.

74.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject.  Lieutenant Ahern is a SIG-certified armorer[3] on the P320.

75.     Only July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the Somerville, Massachusetts, police department hitting him in his leg and causing substantial injuries to his leg.

76.     In August 2019, a Philadelphia transit officer's P320 fired un-commanded while fully holstered, nearly striking a bystander in the subway. The incident was captured on video, and the officer was returned to duty the next day.

77.     The transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull.  The officer, Craig Jacklyn, later stated:

---

[3]     According to SIG Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty.  Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.sigsaueracademy.com/course/armorer-certification

This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt . . . someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

78.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's sheriff's office fired un-commanded on another Loudon County deputy sheriff, Carl Costello, hitting him in his leg.

79.     On October 10, 2019, officer Jacques Desrosiers, also of the Cambridge, Massachusetts, police department, was shot by his P320 without a trigger pull.  The round caused severe and life-changing injuries that are too graphic to set forth.  The spent casing of the round did not eject.

80.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon.  Upon inspection it was found that the spent casing did not eject.

81.     The Kneski discharge was investigated by Major Peter J. Villani of the Veterans Affairs police agency, also a SIG-certified armorer on the P320.  In his report he noted the following:

After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig Sauer  to the distributor prior to the point of sale already with the "upgrade" completed.  The sidearm had approximately 100 rounds through it since purchased.

Upon further examination of the internal parts of the frame module, I noticed that the foot of the striker that catches the [sear] has noticeable side to side and up and

19

down movement within its channel along with upward movement of the slide from the frame.  Also, the edge of the striker foot which has a height thickness of approximately 2mm, is only making contact with approximately .25 of a mm of the leading edge only of the disconnector hook.  Since the striker has been changed with a lighter weight version during the "upgrade program", it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear].

82.     On November 9, 2019, a P320 fired un-commanded on officer Matthew

Gardette of the Manteca, California, police department as he was getting ready for work.

As he merely attempted to place and fasten his duty belt around his waist, the P320

discharged inside the holster.

83.     The holster was a Safariland level three holster with the hood cover up

securing the pistol.  The round blew out the bottom of the holster, impacted the locker room

floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a

locker door.

84.     On December 2, 2019, a P320 fired un-commanded while in the possession

of Detective David Albert, also of the Cambridge, Massachusetts, police department.

85.     Upon information and belief, employees at Sig Sauer's own training academy

in New Hampshire have admitted to accidental discharges causing injury in both 2016 and

2017.

86.     To date, despite numerous requests in 2017, 2018 and 2019, SIG has not

recalled the P320, though it has done so in the past for other of its products with far fewer

overall unit sales.

87.     In an interview in 2013, SIG's former Chief Financial Officer, Timothy Scullin,

just before the P320 was brought to market in 2014, noted that Sig's revenue had risen

approximately 1,400 percent from 2012 to 2013.  He  further stated that Sig Sauer's Growth

has outpaced the firearms' industry's growth by "two or three times."

88.     When asked what some of his biggest professional challenges he has faced

in his career, he stated:

> At SIG, to grow this fast, people get really challenged.  When you're growing 70 to
> 80 percent in a year, all the systems get stretched, and the people really get
> stretched.  You have to be able to manage multiple tasks in a very fast environment,
> and in an environment that's highly regulated, so you can't mess up, otherwise you
> get shut down.  It just creates a tremendous of stress on the people in the system.
> But we've got people that have risen to the challenge.

89.     On December 19, 2019, Jinn served a preservation of evidence letter on SIG.

90.     Despite receiving this letter the following day, and originally agreeing to

quarantine the weapon pending this commencement of this civil action, SIG employees took

possesion of and disassembled his weapon at their headquarters in New Hampshire on or

about January 29, 2020, over Jinn's protests.

## COUNT I

## NEGLIGENCE

91.     Jinn incorporates paragraphs 1 through 90 by reference.

92.     At all relevant times, SIG owed Jinn the duty to design the P320 weapon,

before selling the gun and placing it into the stream of Commerce, in such a manner and

with the exercise of reasonable care, so as to prevent it from firing upon him merely by

drawing the weapon.

93.     At all relevant times, SIG owed Jinn the duty to manufacture, assemble, inspect and/or test its P320s in such a manner, and with the exercise of reasonable care, before selling the gun and placing it into the stream of commerce,so as to prevent it from firing upon drawing the weapon.

94.     At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Jinn, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

95.     SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

ii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

iii.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Jinn, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vi.    By failing to discover the defective, hazardous and unreasonably dangerous  conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

viii.    By acting with complete disregard for Jinn's safety and those around him.

96.    SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

97.     The gun's defective condition was not visible and Jinn was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

98.     SIG' negligence as alleged in this Count directly and proximately caused the July 24, 2019 un-commanded discharge and Jinn's injuries resulting from the accident.

99.     As a direct and proximate result of the negligence set forth in this Count, Jinn suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Jinn will suffer such losses and impairments in the future.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

100.    Jinn incorporates paragraphs 1 through 99 by reference.

101.    At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Jinn's injuries.

102     SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

103.    At all relevant times, Jinn used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG.

SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

   i.  Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

   ii.  Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

   iii.  Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

   iv.  Negligently failing to unambiguously warn purchasers and end users of the gun, including Jinn, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

   v.  Failing to discover the defective, hazardous and unreasonably dangerous  conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi.     Negligently failing to place a warning about the danger of mere

"vibration" of the gun in a conspicuous manner, such as on its case, which

could be easily understood by a consumer, instead of relying on changing the

bottom of page 25 of the user manual for the gun after several incidents of

accidental discharges;

104.    Jinn, as the end user of the gun, was a person who would foreseeably be

injured by breaching the implied warranty referenced in this Count and SIG's breach of the

warranty of merchantability as alleged herein directly and proximately cause the accident on

February 7, 2018 and Jinn's claimed injuries.

105.    As a direct and proximate result of the breaches set forth in this Count, Jinn

suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the

enjoyment of life, physical deformity and handicap and embarrassment associated with the

same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and

life care expenses for his care and treatment. These injuries are either permanent or

continuing in their nature and Jinn will suffer such losses and impairments in the future.

## COUNT III

## STRICT LIABILITY

106.    Jinn readopts and re-alleges all the preceding paragraphs of this Complaint

as if fully set forth herein.

107.    At all times material hereto, SIG was in the business of marketing, selling,

and distributing weapons, including the gun causing Jinn's injuries. Upon information and

belief, SIG knew or had reason to know the gun would be situated in holsters that would

need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

108.   Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time, and was free from any design or manufacturing defect.

109.   At all relevant times, Jinn used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

110.   The weapon at issue contained a design and/or manufacturing defect.  SIG is strictly liable for the design and/or manufacturing defect in Jinn's P320 and for acting with complete disregard for Jinn's safety and those around him.

111.   As a direct and proximate result of the design and/or manufacturing defect, Jinn suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Jinn will suffer such losses and impairments in the future.

## COUNT IV

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

112.   Jinn readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

113.    By its actions, SIG knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled.  Yet is presented to the Loudoun County Sheriff's Department including Jinn, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

114.    SIG's conduct created an unreasonable risk of causing the plaintiff emotional distress;

115.    Jinn's emotional distress was foreseeable;

116.    The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in severe bodily harm; including severe damage to his right leg;

117.    SIG's conduct was the direct and proximate cause of Jinn's distress.

118.    The trigger was not pulled by Jinn, yet the weapon still fired and shot him in the leg, narrowly missing his femoral artery, which would have been a mortal injury.

119.    As a direct and proximate result of the breaches set forth in this Count, Jinn suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Jinn will suffer such losses and impairments in the future.

## COUNT V

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

120.   Jinn readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

121.   Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun more than a year before Jinn was shot in February 2018.

122.   Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Jinn.

123.   Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before February 2018, or recalled it as repeatedly requested, Jinn never would have been shot. The round discharged from his weapon easily could have taken his life or someone else's life at the Rodman's Neck range that day.

124.   SIG knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the gun instead of a mandatory recall.  SIG's conduct shows and intent to cause, or disregard of a substantial probability of causing, severe emotional distress;

125.   SIG's conduct in this matter was self-serving, deceptive, reckless, intolerable and outrageous as described above, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

126.   SIG's conduct was the direct and proximate cause of Jinn's distress.

127.    The emotional distress sustained by Jinn was severe, and was accompanied by severe and permanent physical injury.

128.    As a direct and proximate result of the breaches set forth in this Count, Jinn suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature and Jinn will suffer such losses and impairments in the future.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1.    Assume jurisdiction over this case;

2.    Empanel a jury;

3.    Award $2 million actual and compensatory damages in any other amount determined by a jury for defendant's negligence and breach of implied warranty;

4.    Award $3 million punitive damages for defendant's actions which were in complete disregard for Jinn's life and safety;

5.    Award $2 million in compensatory and punitive damages under New York common law for negligent and/or intentional infliction of emotional distress;

6.    Award plaintiff costs and reasonable attorneys' fees in bringing this action;

7.    Order defendant to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 stating that the weapon can fire without a trigger pull;

8.    Retain jurisdiction over this case until defendant has complied with all

orders of the Court;

9.      Award such other relief as the Court deems appropriate.

The plaintiff demands a trial by jury on all counts.

PLAINTIFF
JIMMY S.C. JINN

By:

_____S/_____

Jeffrey S. Bagnell
Federal Bar No. JB7772
Jeffrey S. Bagnell, Esq., LLC
55 Greens Farms Road, #200-60
Westport, Connecticut 06880
(203) 984-8820
(203) 255-4454 (fax)
jeff@bagnell-law.com

Counsel for Plaintiff

Dated: FEBRUARY 10, 2020