# Table of Contents

**Summary…………….……………………..3**

**Factual Background……………....……….6**

**Governing Law…………………………….9**

**Discussion…………………………………11**

**Conclusion…………………………………26**

# Table of Authorities

Page(s)

Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
   509 U.S., 113 S.Ct. 2786 ..................................................................... 5, 6, 9

*Difrancesco v. Win-Sum Ski Corp.*,
   No. 13CV148, 2017 WL 1046741 ........................................................ 23

*Sawyer v. Dreis & Krump Mfg. Co.*,
   67 N.Y.2d 328, 502 N.Y.S.2d 696 (1986) ......................................... 23

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................ 5, 9

*Maharam v. Maharam*,
   510 N.Y.S.2d 104 (1986) ....................................................................... 6

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995)................................................................ 10

*Peters-Martin v. Navistar Int'l Transp. Corp.*,
   410 F. App'x 612 (4th Cir. 2011) .................................................. 4, 11, 38

*United States v. Locascio*,
   6 F.3d 924 (2d Cir.1993)...................................................................... 10

*United States v. Simmons*,
   923 F.2d 934 (2d Cir.)......................................................................... 10

Rules

Fed. R. Ev. 801(d)(2)(A) ......................................................................... 24
Fed. R. Evid. 702 .......................................................................... 3, 9, 10, 41
Fed. R. Evid. 702(a)-(d) ............................................................................ 9

_____

|  |  |  |
|---|---|---|
| JIMMY S.C. JINN, | : | CIVIL ACTION NO.: 20-cv-1122 |
| | : | PGG-RWL |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SIG SAUER, INC. | : | |
| | : | |
| | : | |
| Defendant. | : | |

_____ :

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO EXCLUDE PLAINTIFF'S EXPERTS PETER VILLANI AND TIMOTHY HICKS**

**I.     Summary**

Defendant's Motions to exclude the opinions and testimony of Jinn's experts should be denied.  Both experts' opinions are based on reliable methodology and sufficient data, and the opinions are relevant to the issues in the case under Fed. R. Evid. 702.

As this Honorable Court is aware, this action is part of a broader national litigation related to defects in the Sig Sauer P320. Plaintiff's experts Peter Villani and Timothy Hicks have each issued reports on prior occasions. Mr. Hicks was permitted to testify in the first and only P320 case in which he has been called as an expert. In the two cases where Mr. Villani has been called as an expert, he has been permitted to testify in one case (*Guay v. Sig Sauer*, *Inc.*) and excluded in the other (*Frankenberry v. Sig Sauer, Inc.*).

In the one matter where Mr. Villani was excluded, the Court held no evidentiary hearing.

In the matter where Mr. Villani was permitted to testify, the Court held a long evidentiary hearing with lengthy testimony from Mr. Villani and Mr. Hicks. Following that hearing, Defendant Sig Sauer, Inc.'s ("Sig") motion to exclude Mr. Hicks was denied in full and its motion to exclude Mr. Villani was denied in part and granted in part. That motion is substantively identical to the instant motion. Sig's Motion for Summary Judgement in that matter, as in the instant matter, is based entirely on its Daubert Motion. In a 20-page opinion denying Sig's Motion for Summary Judgment, Chief Judge Landya M. McCafferty wrote:

> "Specifically, Villani observed and measured the contact area between certain parts of the P320 that, given his knowledge and experience about how pistols operate, he knows are meant to stay in contact or engaged with each other until the gun's trigger is pulled.  Villani observed that the edges of these parts he analyzed are rounded.  Based on his measurements and observations, and his knowledge of firearms components and their mechanics, Villani concluded the parts could slip over each other and allow the gun to be fired without someone pulling the trigger.  Because the opinion is supported by reliable foundations - - Villani's measurements, observations, and his experience about how firearms work - - it is sufficiently reliable to be admissible.

. . .

> Hicks is qualified to opine about all aspects of his opinion.  Hicks is a mechanical engineer with substantial experience, and he specializes in the technicalities of product performance and failure.  Accordingly, his training and experience provide a basis for expertise in the mechanical workings of a product, including a gun."

*Guay v. Sig Sauer, Inc.*, 1:20cv00736 (LM) Docket No. 72,  (July 11, 2022) (D. NH.) (Ex. 1, pp. 12, 16).

Sig's memoranda do not cite Judge McCafferty's opinion as it was issued about six weeks after Sig served its Motions on May 27, 2002.

Hicks, a mechanical engineer with substantial firearms experience, has with sufficient basis opined that Jinn's gun fired while fully seated in holster after reviewing CT scan images of the gun, up-close images of the surfaces of the striker foot and sear face inside its fire control unit,

several other P320s that contained the same manufacturing defects,[1] a missing safety lever return spring, and the facts of the incident.

Villani, an armorer on the P320 - - certified by Sig Sauer itself, has opined based on vast experience with firearms that Jinn's P320, and numerous others he personally inspected, all possessed substantial manufacturing defects that would allow the gun to discharge without a trigger pull. This is hardly a novel or unreliable opinion given that Sig's own August 4, 2017 press release on the P320 stated that mere "vibration" could make the gun's safety mechanism fail. (Ex. 2). Contrary to what Sig suggests in its memoranda, it is settled that:

> An expert witness can testify on the basis of his own experience alone. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

So long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities*." Id.* at 596, 113 S.Ct. 2786.

Villani need not possess a degree in mechanical engineering, as Hicks does, to have extensive "specialized expertise" and knowledge in firearms and specifically the Sig P320, which the jury should be allowed to weigh. In addition, he testified last month as an expert before a jury in the District of New Hampshire in the *Guay* matter.

Sig should be required tell a jury why it allegedly means nothing that he was certified by

---

[1] "Examination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of spoliation". *Peters-Martin v. Navistar Int'l Transp. Corp.,* 410 F. App'x 612, 620 (4th Cir. 2011).

Sig as an armorer on the P320, why it should otherwise discount his extensive specialized knowledge and expertise regarding semi-automatic firearms, and all the real-world replication of the P320 firing on its own. There is no peer reviewed literature on the P320's defect as it is a relatively new deSign, a fact Sig recently conceded in summary judgment papers filed in the Western District of Kentucky in another P320 case. *Mayes v. Sig Sauer, Inc.*, 1:2019cv0014 (W.D. Ky.) (Docket no. 71) (Def. Mem. Law, p. 16 ("[n]or has he identified a single peer-reviewed study - - because none exist").

Nor is reliance on peer-reviewed studies a *sine qua non* of *Daubert* analysis in any case. *See Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir. 2002) ("[t]his is not to suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions"). So long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities, *id.* at 596, 113 S.Ct. 2786.

Finally, contrary to what Sig suggests, a litigant is "not required to prove causation to a mathematical certainty. Indeed, whether there is prima facie proof of proximate cause is determined by the trial court 'upon mixed considerations of logic, common sense, justice, policy and precedent.'" *Maharam v. Maharam*, 510 N.Y.S.2d 104, 108 (1986), *citing* Prosser & Keeton, The Law of Torts [5th ed, 1984] § 42, p. 279, quoting 1 Street, Foundations of Legal Liability (1906), p. 110.

## II.  Factual Background

Former Homeland Security Investigations Agent Jinn contends that his DHS-issued P320

6

catastrophically malfunctioned and shot him without a trigger pull on July 24, 2019. The bullet caused severe damage to his right leg including permanent nerve injury according to his expert neurologist. (Ex. 3).

At the time Jinn's P320 discharged on July 24, 2019 he was conducting tactical shooting during qualification at the Rodman's Neck range. As Jinn pushed his hand down on the weapon's grip while holstered to begin the draw process, it fired one round through his holster into his right leg. It entered his thigh, traveled to his knee and exited his calf. He was rushed to Jacobi Medical Center in the Bronx where he underwent emergency fasciotomies for limb salvage and hemorrhage control. Thereafter he developed numbness and paresthesia of his lower right leg. He further developed deep vein thrombosis putting him at risk for a pulmonary embolism and death and was required to take blood thinners and painkillers for many months.

He continues to suffer lower leg numbness and pain in his posterior thigh whenever he is required to stand or sit at length and can no longer run or function the way he had been before the incident. He has disclosed an expert neurologist's report detailing these injuries which include permanent nerve damage to his leg.

Contrary to what Sig states, Jinn, an HSI agent with 24 years of experience, was not "racing" to draw the pistol from his holster as if he was in some frenzied state; he was engaged in a normal, professional draw of the weapon to hit a target before a fellow agent:

Q. And can you just explain for me what a speed drill exercise is?

A. Basically, you have two people --two people on the firing line, and you have to shoot a middle target. And when the instructor blows the whistle, whoever shoots the target first stays on the line and the loser will leave and the next person will come, and you just -- it's a competitive speed drill.

(Ex. 4, Jinn dep., p. 76).

Jinn testified that the P320 was in his holster when it discharged. Jinn Dep. at p. 94:9-14 ("[t]he gun was still in my holster"). In his November 19, 2019 interview with the DHS's Office of Professional Responsibility after the incident, Jinn also stated that nothing got in his holster, the gun was *"not even"* half-way out of his holster, that it fired "in his holster," and he "did not pull the trigger." (See Ex. 4 to Jinn's Local Rule 56a1(b) statement, recorded interview with DHS Office of Professional Responsibility). Sig's assertion that Jinn has said two different things about what happened, i.e., that it was in holster, and "half out" the holster, is therefore incorrect. (Def. Mem. of Law in support of Motion for Summary Judgment, p. 3).

The point of the exercise he and other HSI agents were engaged in was to draw the weapon as quickly as possible and hit a target. It was not to withdraw the weapon in some hesitant fashion. For SIG to suggest that Agent Jinn was somehow out of control that day is therefore invalid. Because his SIG/Bladetech holster was new and tight, he was forced to push down on the P320 before drawing it out. As he pushed down on the weapon's grip, the P320, a single-action striker-fired pistol with no external safeties, discharged and shot him. He never touched let alone pulled the trigger:

Q. So describe for me what happened.

A. So it was me and another agent on the line doing the drill, and we were waiting for the instructor to blow the whistle. So during that time period, I had time to use my hand, make sure there was nothing in the way, my T-shirt wasn't tucked out. There was nothing that would have gotten stuck in the holster. So I checked everything. Then, as soon as I heard the whistle, I reached -- I used my hand and reached to reach my gun. And as I was pushing it down, in the process of pulling it out, the next thing, all I felt was a vibration. I didn't even hear the gunshot wound go -- I didn't even hear -- I didn't even hear the gunshot. All I -- now, the gun was still in my holster, and my hand was on the grip. Then the next thing, I felt the vibration throughout my whole body. I didn't know what happened for a couple seconds. Then all of a sudden, I felt extreme pain, and my whole body started vibrating. Then

> I was in such excruciating pain, I fell to the floor. I didn't know what happened. I didn't even hear the gunshot. I went into shock and I fell to the ground.

(Ex. 4, Jinn dep, pp. 81-82).

## III.   **Governing *Daubert* Law**

### A.   ***Daubert* does not nullify the jury's role as fact finder**

Under Rule 702 of the Federal Rules of Evidence, an expert witness' testimony must, among other things, be "based on sufficient facts or data," and must be "the product of reliable principles and methods." Fed. R. Evid. 702(a)-(d). In fulfilling its gatekeeping function, a district court "must conduct a preliminary assessment" to determine whether the methodology underlying the expert witness' testimony is valid. *Id.* (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786). District courts have "considerable leeway" in determining the manner in which they evaluate an expert witness' reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

As noted, an expert witness can testify based on his own specialized experience. *Kumho*, 526 U.S. 137, 156 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Ultimately, it is the reliability of the expert witness's opinion that the court evaluates in its role as gate keeper, not its credibility.

Further, an expert may form his or her opinion based on experience or knowledge gathered working in the [relevant] industry, which prevents complete preclusion of a party's expert. *See, e.g., McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995)

(allowing consulting engineer to testify as expert regarding whether a worker was withing "breathing zone" of toxic fumes). The *McCullock* court rejected Daubert challenge to his testimony because of his "extensive practical experience" and "specialized knowledge in the area: "[w]e find that Woolley's testimony easily qualifies for admission under *Daubert*. Fuller's argument ignores Woolley's *extensive practical experience*. *Supra* pp. 1041–42. Woolley's background and practical experience qualify as *"specialized knowledge" gained through "experience, training, or education*," Fed.R.Evid. 702, and his testimony was properly admitted. *Cf. United States v. Locascio,* 6 F.3d 924, 937 (2d Cir.1993), *cert. denied,* 511 U.S. 1070 (1994); *United States v. Simmons,* 923 F.2d 934, 946 (2d Cir.), *cert. denied,* 500 U.S. 919 (1991). The court went on to note, "Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility. *Id.* (emphases added).

Finally, since Sig is heavily relying on one South Carolina district court case, in which no evidentiary hearing was held, it seems appropriate to cite a Fourth Circuit opinion that endorses Hick's and Villani's methodology and would allow their testimony: "[e]xamination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of

spoliation". *Peters-Martin v. Navistar Int'l Transp. Corp.,* 410 F. App'x 612, 620 (4th Cir. 2011).

## IV.    Discussion

### A.    *Overview*

Contrary to what Sig states, a rational jury could find based on the evidence is that Jinn's P320, like so many others, fired without a trigger pull when he was pushing it down in his new holster before drawing it.  This is his unambiguous testimony.  A fully seated discharge means that the trigger could not have been pulled by Jinn's finger because the trigger is covered by the holster.  That SIG's experts disagree with Hicks' and Villani's conclusions simply means that they have a different opinion; it does not mean that a jury should not be allowed to hear and weigh Jinn's experts' testimony.

Hicks' and Villani's opinion that Jinn's P320 had manufacturing defects that could have allowed it to fire without a trigger pull under certain conditions, is at least relevant to the issues in the case.  Jinn's claim is that his P320 shot him without a trigger pull according to: (i) his own testimony, (ii) the weapon's long history and pattern of inertial discharges, (iii) Sig's own statement that vibration can make the P320 fire, and (iv) his experts' analysis and reports.

Unlike the Philadelphia subway holstered discharge and numerous other P320 incidents around the country discussed *infra*, no videotape of what happened that July day exists. Regardless, SIG's attempt to characterize Jinn's weapon as perfectly fine is contradicted not just by his experts' opinions, but its own "urgent" universal replacement of the entire striker and firing assembly for all P320s purchased by the Army approximately two years before Jinn was shot, in May 2017.  (Ex. 5).  By itself this fact establishes Sig's knowledge of serious

mechanical problems with the P320, including its sear, striker and trigger assembly, long before Jinn was shot.

A jury should be allowed to weigh this evidence.

**B.**   ***The opinions of Timothy M. Hicks are based on sufficient data and reliable principles.***

Hicks possesses substantial experience with firearms and is a mechanical engineer as stated in his report and in his three Sig depositions and trial testimony to date in *Jinn v. Sig Sauer, Inc.*, *Mayes v. Sig Sauer, Inc.,* and *Guay v. Sig Sauer, Inc.* Contrary to what Sig claims, his report establishes that he has significant experience with firearms investigations, functions and testing:

> **Timothy M. Hicks, P.E.** is a Principal Engineer and has a diverse background in mechanical deSign and system evaluations, including accident reconstruction. He spent close to 20 years in various roles in the automotive industry, responsible for the deSign, manufacturing, testing, and validation of vehicle systems. He also has experience in leadership roles for commercial vehicle suppliers and manufacturers, including leading advanced engineering teams. This experience includes conformance to governmental regulations, equipment safety, maintenance and service requirements, and field performance investigations. As part of his consulting experience, **he has performed numerous investigations and certification tests on firearms and firearm safety devices, pursuant to California and Massachusetts state regulations, and for incidents involving firearms. For the investigation described in this report, his investigation methods are in accordance with the generally accepted standards and practices of his field, including utilizing the scientific method.**
>
> Mr. Hicks is a Professional Engineer licensed by examination in the State of Illinois, and by comity in other states. He is an active member of the Society of Automotive Engineers (SAE) and has been elected as Chair of the Chicago Section in 2018. The Chicago Section numbers over 1,000 members. He is also a member of the American Society of Mechanical Engineers (ASME), and the National Society of Professional Engineers (NSPE). **He also holds Certificate of Eligibility from the California DOJ Bureau of Firearms and Massachusetts Firearms Records Bureau Executive Office of Public Safety for analyzing and performing firearm certification testing. (Ex. 11, p. 1).**

He also has substantial experience with testing and inspection of firearms:

Q.   All right. So prior to March 17, 2021, would it be fair to say that you have inspected and tested approximately rough estimate 50 firearms pursuant to California certifications?

A.    I think the short answer is yes, related to performing those duties.

(Ex. 6, Hicks dep., p. 64).

Hicks' expert report is attached as exhibit 7.  It provides a careful, compelling and

detailed failure analysis of the defects in Jinn's P320, including a missing safety return

lever spring.

For example:

Examination of **Special Agent Jinn's** pistol found several deSign and manufacturing defects, consistent with the previous P320 firearms inspected, which fired un-commanded under similar circumstances.  These defects explain **Special Agent Jinn's** report of un-commanded (no trigger pull) discharge of the firearm.  The following items were identified:

1.  The sear and striker pin components are both produced using a Metal Injection Molded (MIM) process and do not have any secondary machining performed on the critical surfaces, including the interface between the two components.  MIM produced components can have areas of uncontrolled variability.  For surfaces where tight tolerances and consistent fit-up are required, MIM parts will typically have secondary processing, or machining, to eliminate the variation.



Figure 2 - Striker assembly with striker foot circled

Figure 3 - Top view of sear (circled) and off-center striker drag marks

2. The sear and striker foot portion of the striker pin both exhibited inconsistencies on the surfaces that are in contact with each other, minimizing the actual contact surface area that is needed to keep the parts engaged until the trigger is pulled. In addition to the MIM manufactured surface (rough and unmachined), both parts also exhibited a raised area around the periphery of the interface surface. This has been referred to by others as rollover and appears to be a combination of flashing, radiused corners, and shrinkage of the inner surface area. The end result is a minimal contact surface area between both components, making the firearm more susceptible to un-commanded discharge. See Figure 4. In comparison, the photos in Figure 5 show the machined (or some other secondary processing after molding) surface of the striker foot and sear from other manufacturers firearms.



Figure 4 - Close ups of sear step (left), and striker foot (right)



Figure 5 - Other brands firearm striker foot (left), and sear face (right), both with machined surfaces

3. In addition to the lack of secondary processing on the sear and striker foot, there is also a vertical misalignment of the two parts, as shown in the CT scan. The striker foot is unable to fully engage with the sear face surface, reducing the area available for the engagement of the two parts. With the minimal amount of overlap and engagement between the two components, a minor amount of vibration or relative movement between the slide and the grip module would allow the striker to no longer be retained by the sear, and to move forward and discharge a round. In other words, the ongoing relative movement between the slide and the grip module while being properly carried in a SIG authorized holster will allow the striker foot to walk off the sear face.



Figure 6 - Subject striker foot to sear contact surface

4. As shown in the CT scan below, there is also a lateral offset between the sear and the striker, causing an unbalanced force on the sear, and off-center contact on the sear. This off-center contact between the two components allows the sear to be tilted in one direction laterally, causing the striker foot to make more contact on one side versus the other. When the sear is consistently tilted in one direction due to the misalignment, it contributes to reducing the actual surface area of contact between the striker foot and the step in the sear. The CT scans showing this are in Figure 7, and Figure 3 shows the off-center drag marks on the top surface of the sear.



**Figure 7 – CT scan slice of striker to sear misalignment**

5. In looking at the front view CT scan slices of the striker pin relative to the housing channel, there is a large lateral gap on both sides of the striker foot, as shown in Figure 8. This allows for axial rotation of the striker pin each time the firearm is discharged and the slide cycles. This rotation will also cause the safety lock tab that makes contact with the parallel horizontal plane of the striker body to be out of alignment, and not parallel, creating a gap. This misalignment would cause minimal contact between the safety lock tab and the rear vertical portion of the striker, thereby reducing the contact area between the two surfaces. This misalignment would allow the striker pin to continue its forward movement when the striker foot is no longer retained by the sear, leading to an un-commanded discharge.



Top view of gap

**Figure 8 - CT scan view from the front of striker gaps to housing (left) and safety lock tab misalignment to striker pin (right)**

6. The CT images from Figure 8 above also illustrate the slide assembly gaps to the grip module (circled in blue). These gaps allow the striker foot (as part of the slide assembly) to move vertically relative to the sear (in grip module) with any vertical pressure, such as that experienced while the firearm is carried in a holster. None of the functional tests performed during the October 2021 inspection, nor any test data produced by SIG SAUER, document the result or impact of this movement. A firearm being carried in, or being properly drawn from, a SIG SAUER authorized customized molded holster, such as the subject holster used by Special Agent Jinn, which protects the trigger from inadvertent movement, would not be considered an external abusive event, as described by SIG SAUER.

7. S**pecial Agent Jinn's** subject P320 **also did not have the safety lever return spring installed** which is needed to fully retract the safety lever after the trigger is released. SIG SAUER discontinued the use of this return spring at some point after initiating the P320 upgrade program. The discontinued use of the return spring by SIG SAUER also contributes to un-commanded discharge as the safety lever does not work as intended, since the safety lever will move outward relative to the fire control unit, which then allows the safety lock to be out of position. When the safety lock is out of position vertically, it will allow the striker to move forward causing an un-commanded discharge. Since the subject P320 was being carried by Special Agent Jinn in a SIG SAUER authorized Blade-Tech holster in a vertical orientation, there is nothing to keep the safety lever, and subsequently make contact with the safety lock, creating the scenario where it would not prohibit the striker movement. This discontinued spring is shown missing in Figure 9.



Figure 9 - CT scan of safety lever with no return spring

Based on these excerpts from his report alone, it is inaccurate and misleading

for Sig to claim that Hicks "made no attempt to determine how the discharge occurred." His report

shows exactly such an attempt, and he reached conclusions about how it did happen

after analyzing a substantial amount of data regarding Jinn's P320. It would be more

accurate for Sig to state simply that it does not agree with his conclusions, rather than that

he made "no attempt" to determine how the discharge happened. (Def. Mem. Law, p. 1).

Sig's claim that Hicks has never "analyzed the deSign of the internal components he

claims are defective as compared with any other pistol model's components" (Def. Mem., p.

3) is also incorrect. Hicks' report in Jinn and other P320 cases establish that he performed

precisely that analysis:

> Q. So for the sear and the striker pin, how the use of MIM affect the performance of those parts?
>
> A. Well, I talk about in my item 1. Because the MIM parts are used as molded, the inconsistency between the deSigned-in interface between the two parts is compromised.
>
> Q. And what effect does that have on the pistol and the performance?
>
> A. That overlap which I have measured in the CT scan is on the order of between - - it depends on whose measurement you use, 30 thousandths and 40 thousandths of an inch, which is in the range of eight pieces of paper thick. So it's that overlap that is holding back the striker force once the weapon is charged. So any motion, any compromise between those surfaces, including, you know, inertia, once it's in a holster being worn, can get the striker to slip off the edge of the sear.

(Ex. 6, Hicks dep., pp. 114-115).

Jinn submits the entirety of his report to the Court for its review rather than recite

its entire content here. Hicks's conclusions are reached to a reasonable degree of scientific

and engineering certainty, contrary to what Sig claims. (Ex. 7, p. 11). He is not merely

guessing or speculating.

Sig declares that "nothing" in Hicks' "work experience or education" qualifies

him to provide any opinions about firearm deSign or manufacture. (Def. Mem. Law, p. 1).

This is inaccurate as shown above. Hicks' testimony and report are limited to how this

specific product, Jinn's P320, failed due to manufacturing and deSign defects. Its complaint that Hicks has never personally "witnessed a P320 fire without a trigger pull" is absurd. (Def. Mem. Law, p. 1). It would be unsafe to an extreme degree to require Hicks or anyone else to "witness" a P320 defectively firing on its own before being worthy to testify about how the weapon can fail. No case law requires an expert to risk his or her life to replicate an event that has already been replicated in real life many times over the last six years. Common sense would prohibit it. What Hicks testified is that he has seen videotape evidence of the P320 firing on its own and that it corroborated his existing opinions:

> Q. Then we go to replication. What did you do to replicate -- well, let me start with this: Would you agree with me that you have not, because you testified to this earlier and I'm starting to repeat it, would you agree with me that you have not replicated a P320 discharge without a trigger pull?

> A. [Not] Personally myself, but I think when you've asked me this before, I talk about the other similar incidents with equally qualified and experienced firearm law enforcement officers.

> Q. Okay. So when -- so you -- you have not, just you, you have not replicated a P320 discharge without a trigger pull; correct?

> A. For the various reasons we've talked about earlier, yes.

> Q. So on the replication portion of this on which you rely for your conclusion, that it was more likely than not that Special Agent Jinn's pistol discharged without a trigger pull, are you relying on instances of other discharges?

> A. Yes.

> Q. Which ones?

> A. I think Mr. Bagnell outlines all those in his complaint. And then the materials that are identified as pertinent in my materials reviewed, the most Significant one is the SEPTA police officer video.

> Q. Okay.

A.    I know there were others. We looked at an image on the Guay matter of a St. Claire, Michigan, officer in the -- outside the wall of the jail. I think it was in the -- the sally port area where he was attempting to remove his holster similar to the other cases that we've talked about where it discharged without his finger anywhere near the trigger.

. . .

A.    I don't know how that would even be accomplished.

Q.    Right.

A.    On top of being very dangerous.

Q.    Right.  So it's not something - - I just want to confirm that that is an animation but no something that you've seen on a subject pistol because you have not seen the internal components while it's firing to do that, correct?

A.    Or in a holster, correct.  Yes.

Q.    Have you ever personally witnessed a P320 fire without a trigger pull?

A.    Not personally beyond the videos of some of the events, including SEPTA, where that was captured on video.  I have personally not been present when one had an un-commanded discharge.

(Ex. 6, Hicks dep., pp. 101, 102, 168-169).

At least six un-commanded discharges of the P320 have been captured on video consistent with Hicks' testimony. Videos of six of these incidents are incorporated into this Motion as Exhibit 8:  Roscommon Michigan (February 2016); Philadelphia's Suburban Station (August 2019); a Milwaukee Police Department parking lot (January 2021); and Saint Clare Prison in Detroit, Michigan (August 2021).

1.  *Roscommon, Michigan February 2016*.

(password:  richardson320).

SIG claims that the officer's "seat belt buckle" somehow dove into the officer's holster and pulled the trigger in this case.  However, the video clearly shows in several frames that the seatbelt

20

is in place and fully retracted.  In addition, a reflection of the officer standing stunned outside his patrol car shows his holstered P320 has nothing attached to it.  The officer himself states in the video that the seatbelt did not make his gun fire and notes that the casing did not eject.

2.      *Southeastern Pennsylvania Transportation Authority (SEPTA) officer Suburban Station, Philadelphia August 2019.*  The incident has occurred as soon as video begins.  At 2:20 to 2:40 mark the officer expressly states that the gun is still holstered.

In his deposition, Jacklyn, a distinguished law enforcement officer who previously guarded the transport of nuclear weapons up and down the East Coast, testified that nothing ever got in his holster to make his P320 discharge as he merely stood to exit a subway patrol cart:

> Q.      Let me ask you some questions, Officer, about your approach basically toward the beauty salon area.  At the time were you playing with your holstered gun?
>
> A.      No.
>
> Q.      At any time did you impact it in any way?
>
> A.      No.
>
> Q.      Did you draw the weapon or attempt to draw it in any fashion?
>
> A.      No.
>
> Q.      Did you try to get at the trigger in any way?
>
> A.      No.
> …
> Q.      Did you take your P320 out of its holster at any point after the discharge?
>
> A.      No, I did not.

3.      *Undercover Milwaukee officer in police department parking lot, Milwaukee, Wisconsin January 2021.*  Discharge is around 1:20-mark.  Note that the officer's hands are full.  The gun launches out of the holster as he exits the car.  The gun hits the side of his car and goes up in the air and then falls to the ground.

4. *Saint Clare Prison, Detroit, Michigan August 2021*. The discharge occurs early in the video. The still frame Hicks references is attached as Exhibit 13.

5. *Rose Casino, Louisiana, December 5, 2021*

Off-duty ICE agent's P320 discharges as she moves her handbag toward a casino gaming table. Occurs at 50-second mark.

6. *Houston, TX, March 28, 2022*

Police officer's P320 discharges as he is getting into his car. Occurs at the 14-second mark.

These incidents all involve not only the exact same manufacturer, *but the exact same model* gun, the P320. They are admissible to show prior notice and dangerousness of conditions. *See Difrancesco v. Win-Sum Ski Corp.*, No. 13CV148, 2017 WL 1046741, at *15 (W.D.N.Y. Mar. 20, 2017) ("[a]s for prior incidents at Holiday Valley, they are admissible in this case provided they are "substantially similar" to the 2010 accident on trial here"); *Sawyer v. Dries & Krump Mfg. Co.,* 67 N.Y.2d 328, 336, 502 N.Y.S.2d 696, 701 (1986) (under New York law, similar prior accidents are admissible to show dangerousness of conditions and notice).

Sig itself has never produced a single videotape or records of any vibrational testing it, or any contractor, performed on the P320 to determine if it can fire without a trigger pull, or allegedly cannot, since the P320 was put into commerce in 2014. Not one video in six years has ever been produced, nor any testing data, other than a rough handling and vibration of test of 10 P320s supplied directly from Sig's headquarters to a third party contractor in October 2021, more than two years after Jinn was shot. It is simply not credible to suggest that a major manufacturer like Sig has no contemporaneous testing data on one of its inherently dangerous products.

What the evidence shows is that Sig stated on August 4, 2017 that "vibration"

22

and "shock" can make the P320 fire.  (Ex. 2).  Many law enforcement agents and civilians have claimed, including Jinn in this case, that jostling or, as in this case, pushing a P320 down into a holster (a clear form of inertial impact or vibration) was enough to make it discharge and shoot them.  The 2017 press release itself is an admission and admissible evidence under Fed. R. Ev. 801(d)(2)(A) ((2) *An Opposing Party's Statement*. The statement is offered against an opposing party and:  (A) was made by the party in an individual or representative capacity").

Sig's additional criticisms that Hicks allegedly failed to rely on any "published studies or material" in conducting his analysis is unjustified.  (Def. Mem. Law, p. 13).  There are none to Jinn's knowledge and Sig cites none.  There is no treatise on how striker-fired weapons fail.  The ability of a striker-fired pistol to fire without a trigger pull is a relatively new phenomenon in the history of firearms and the deSign itself, on a commercial level, is relatively new also.[2]

C.    ***The opinions of Peter Villani are based on sufficient data and reliable principles***

Like Hicks, Villani in his report noted several defects with the P230. Villani personally inspected and supervised the CT scan imaging of Jinn's P320.  At the end of his analysis, he concludes:

> After reviewing the defects in the subject P-320, I have concluded to a reasonable degree of certainty that a combination of the following defects did create a "perfect storm" scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the P-320.

---

[2]    "Hammer-fired handguns have withstood the test of time and are still manufactured to this day for those that wish to have a pistol that can be double or single action. Striker-fired handguns, however, are more modern and have seen a huge increase in commercial adoption in the last few decades due to some big brands like Glock, FNAmerica, Sig Sauer, and Smith & Wesson."  https://www.triangleshootingacademy.com/ccms/index.cfm/newsarticles/resource-center/hammer-fired-vs-striker- fired/

A) The fact that the striker is able to pivot left or right within the striker housing.

B) The pivoting of the striker causes the safety lock tab to become misaligned to the striker, which allows the tab to be bypassed by the striker moving forward.

C) The presence of a rounded edge on top of the striker stop, can cause the tab to "jump" up and over the stop from the force of the striker moving forward and contacting the uneven "positive contact" surface of the safety lock tab.

D) The presence of excess molding material along the striker foot which causes insufficient "positive contact" to the sear.

E) The lack of normal "positive contact surface" between the sear and striker due to insufficient dimensions (sear face 1.18mm versus striker foot 1.21mm).

F) The off-centering of the striker to the sear causing irregular pressure on the sear springs which puts the sear out of its horizontal alignment to the striker foot.

G) The constant movement (up/down/left/right or twisting/torquing) of the slide, independent of the grip module causing the striker to eventually "walk off" of the sear face while the striker is pivoted at an angle as the safety lock tab is now misaligned.

H) Any movement of the slide independent of the grip module by either simply carrying the firearm in a holster, attempting to remove the firearm from its holster, or any twisting or torquing of the grip module or slide causes the striker foot to begin "waking off" of the sear face since the sear is connected to the FCU which is housed in the grip module, and the striker assembly is connected to the slide, separate movement between both groups can occur.

I) Depending upon the condition of the individual P-320 components' status, (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported deSigns or manufacturing defects could lead to an uncommanded discharge.

(Ex. 10, Villani report).

Villani's methodology was not limited to disassembly of the pistol. He makes

this very clear in his report on Jinn's gun:

1)       I began photographing the fire control unit and determined that the safety lever return spring was missing (See CT scan Image VGL 1E, CT Scan Image Guay0001 as comparison with spring and Image 5E). The removal of this key safety part has been noted by Sig Sauer in their updated Armorers manual page 69, where Sig Sauer states: "THIS SPRING HAS BEEN ELIMINATED FROM CURRENT PRODUCTION. THE SAFETY LEVER USES GRAVITY TO REST IN THE LOWERED POSITION."

Image VGL 1E (Jinn, no spring) Image 5E

 

2)       The issue with omitting the safety lever return spring is that the uncommanded discharges with the P-320 occur mostly when it is holstered in the vertical position, not in the horizontal position. When the safety lever is in the vertical position, it can then move *outwards* from the fire control unit which can result in it making physical contact with the bottom of the safety lock which is an average of half a millimeter (.50 mm) above the top of the safety lever. Once the safety lever moves outward and makes contact with the safety lock, there is the possibility of the safety lock being pushed upward the thickness of itself which is approximately .83-.91mm thick depending on whether or not the safety lock is produced by MIM (Metal Injection Mold) or stamped steel. Once this occurs, the safety lock is not in a position to stop the striker from travelling forward during an uncommanded discharge as the safety lock is disengaged by the safety lever that is now allowed to move outwards since the safety lever return spring has been omitted by Sig Sauer intentionally from production.

3)       I also photographed the striker foot and determined that the positive contact surface was impeded by excess molding material (rollover) around its perimeter edge which can cause less contact between the positive contact surfaces of the sear and striker foot. (See images 10E, 26E, and 24E)

Image 10E                                        Image 26E

 



Image 328
Windham Weaponry
model AR-15 rifle
sear face
Top view finished properly.
No excess molding
material present

**<u>Conclusion</u>**

20) After reviewing the defects in the subject P-320, I have concluded to a reasonable degree of certainty that a combination of the following defects did create a "perfect storm" scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the P-320.

(Ex. 9).

The South Carolina court correctly states that Villani "took measurements of the internal components of the Pistol and compared them to measurement of components from exemplar pistols."  That is precisely what the Fourth Circuit overseeing the South Carolina

District Court held was a proper methodology in *Peters-Martin*:

> "*Examination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology* for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of spoliation".

*Peters-Martin,* 410 F. App'x 612, 620 (4th Cir. 2011) (emphasis added).

The *Peters-Martin* court describes exactly what Villani and Hicks did with the Jinn gun and other P320s. It, along with Judge McCafferty's detailed decision, should take precedence over a district court case that does not accurately recount the inspection methodology employed by Villani.

Finally, the South Carolina court's claim that Villani could not "confirm" that his rollover theory could cause the spring-charged striker foot and sear face connection to fail is incorrect. While like Hicks he did not conduct any experiments shaking a loaded P320, putting his life at risk, Villani testified that the failure has been replicated in real life many times:

Q.    Have you seen the video of this incident [Saint Clare Prison]?

A.    Yes, I have.

Q.    The photograph, the still photo that is Exhibit 2, Plaintiff's Exhibit 2, you are familiar with that photo; correct?

A.    Yes, I am.

Q.    Does it show the officer's index finger completely outside of the holster?

…

Q.    Looking at that photo, do you have any doubt whatsoever that the officer did not pull the trigger of that gun?

MR. GIBSON: Objection.  Form and foundation.

A.     I have no question that he did not pull that trigger. His finger, his index finger was off of the trigger, and the gun was in his holster.

Q.     Was his finger outside the holster?

A.     Yes.

(Ex. 10, Villani dep., pp. 148-149).

SIG is free to cross-examine both experts at trial.  But to claim that their methods were somehow junk science, unreliable, or guesswork is not credible.  Moreover, both were qualified under Fed. R. Evid. 702 and testified as experts in the *Guay* case last month.

**IV.     Conclusion**

For the reasons stated, defendant's Motions to Exclude Evidence and Opinions of Jinn's experts and for Summary Judgment should be denied.

PLAINTIFF
JIMMY S.C. JINN

By:

/s/__*Jeffrey S. Bagnell*_____
Jeffrey S. Bagnell
JB7772
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West, Suite 200
Westport, Connecticut 06880
(203) 984-8820
jeff@bagnell-law.com

/s/ *Robert W. Zimmerman*_____
Robert   W.   Zimmerman
Pa Bar ID 208410
Saltz Mongeluzzi & Bendesky, P.C.
1650 Market Street
Philadelphia, PA 19103
215 990 2213

dceisler@smbb.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the undersigned counsel has electronically served the foregoing on counsel for defendant:

Robert L. Joyce, Esq.
Robert.Joyce@littletonpark.com

B. Keith Gibson, Esq.
Keith.gibson@littletonpark.com

Counsel for defendant SIG Sauer, Inc.

By: ___/s/_*Robert W. Zimmerman*_
Robert W. Zimmerman