USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   4/12/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

JIMMY S.C. JINN,                                :          20-CV-1122 (PGG) (RWL)
                                                            :
                              Plaintiff,        :          **REPORT AND RECOMMENDATION**
                                                            :          **TO HON. PAUL G. GARDEPHE:**
                                                            :          **MOTIONS FOR SUMMARY**
                - against -                     :          **JUDGMENT AND TO EXCLUDE**
                                                            :          **EXPERT TESTIMONY**
                                                            :
                                                            :
SIG SAUER, INC.,                                :
                                                            :
                              Defendant.        :
---------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Jimmy S.C. Jinn ("Jinn" or "Plaintiff") alleges that he suffered serious injury when his Sig Sauer P320 pistol fired in its holster without him pulling the trigger.  Plaintiff asserts claims for negligence, breach of implied warranty of merchantability, strict liability, negligent infliction of emotional distress, and intentional infliction of emotional distress, all premised on the allegedly defective design and/or manufacture of the P320 by Defendant Sig Sauer, Inc. ("Sig" or "Defendant").  Defendant has moved to 1) exclude the testimony of both of Plaintiff's expert witnesses pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and its progeny; and 2) for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff opposes and has moved to admit a video exhibit in further support of its opposition to Defendant's summary judgment motion.  For the reasons that follow, I recommend that Defendant's motions to exclude and for summary judgment be GRANTED and Plaintiff's motion to introduce the video exhibit be DENIED.

## FACTUAL BACKGROUND[1]

At the time he was injured, Jinn was an employee of the United States Department of Homeland Security ("DHS").  (Def. 56.1 Statement ¶ 1.)  DHS issued Jinn a P320 model pistol in 2019, with which he was required to qualify on a quarterly basis.  (Def. 56.1 Statement ¶¶ 2-3.)  On July 24, 2019, after completing his qualifying exercises, Jinn participated in a speed drill exercise with his coworkers at the Rodman's Neck range in the Bronx.[2]  (Pl. 56.1 Statement ¶ 5; Jinn Dep. at 74-76.[3] )  In the speed drill, two participants stood on the firing line and, upon the instructor blowing a whistle, attempted to be the first to draw their pistol, fire, and hit a target. (Jinn Dep. at 76-77.)  The first participant to hit the target remained on the firing line and faced the next competitor.  (Jinn Dep. at 76-77.)

Jinn won his first two rounds of the speed drill without incident.  (Jinn Dep. at 77.) On his third round, however, when pushing down on his pistol to remove it from a tight, new holster, the pistol fired one round into his leg.  (Jinn Dep. at 82-85; Def. 56.1 Statement ¶ 9.)

---

[1] The facts are drawn from the Complaint, the parties' statements of material fact filed pursuant to Local Rule 56.1, and the exhibits submitted therewith. "Compl." refers to Jinn's Complaint filed at Dkt. 1.  "Def. 56.1 Statement" refers to Defendant Sig Sauer, Inc.'s Separate Statement Of Material Facts at Dkt. 61-1.  "Pl. 56.1 Statement" refers to Plaintiff Jinn's Response To Defendant's Statement Of Material Facts And Statement Of Facts In Dispute at Dkt. 68.

[2] Sig describes the speed drill exercise as a "quick-draw speed shooting competition," a characterization that Jinn opposes to the extent it "implies that the plaintiff … was handling [his] weapon in an irresponsible fashion."  (Def. 56.1 Statement ¶ 5; Pl. 56.1 Statement ¶ 5.)

[3] "Jinn Dep." refers to the transcript of the August 26, 2021 deposition of Plaintiff, excerpts of which are filed, inter alia, with the parties' Rule 56.1 statements at Dkts. 61-4 and 68-1 and as exhibits to the Defendant's *Daubert* motions at Dkts. 57-3 and 59-2.

The parties dispute how far out of the holster the gun was when it fired, as well as whether Jinn, or a foreign object inside the holster, actually pulled the trigger. (*Compare* Def. 56.1 Statement ¶¶ 13, 21, 28 *with* Pl. 56.1 Statement ¶¶ 13, 21, 28 and at 5.) Jinn alleges that his P320, and others like it, are designed and manufactured with defects, including a faulty striker-sear connection, that allow the gun to fire un-commanded and, in fact, caused the un-commanded discharge of his pistol. (Pl. 56.1 Statement ¶¶ 13, 17.) Jinn alleges that over 80 similar incidents of P320 pistols firing without a trigger pull have occurred, lending credence to his assertions. (Pl. 56.1 Statement ¶ 17 and at 5-7.) Plaintiff submitted reports and deposition testimony from proffered experts Peter Villani ("Villani") and Timothy Hicks ("Hicks"). (Dkts. 68-2 (Hicks report), 68-3 (Villani report), 67-6 (excerpt of Hicks deposition), 67-10 (excerpt of Villani deposition).) Both Villani and Hicks identify purported defects and conclude that defects in the design and/or manufacture of the P320 caused Jinn's pistol to fire without him pulling the trigger.

## PROCEDURAL BACKGROUND

Jinn filed the action on February 10, 2020. (Compl.) Sig filed its Answer on April 2, 2020. (Dkt. 9.) On April 28, 2022, after the close of both fact and expert discovery, the Court set a briefing schedule for *Daubert* and dispositive motions. (Dkt. 48.) On May 27, 2022, Sig filed a motion to exclude Jinn's expert Villani (Dkts. 56-57), a motion to exclude Jinn's expert Hicks (Dkts. 58-59), and a motion for summary judgment in its favor. (Dkts. 60-61.) Jinn filed one brief in opposition to both *Daubert* motions and a separate brief in opposition to the motion for summary judgment on August 9, 2022. (Dkts. 67-69.) Sig filed replies in support of its *Daubert* motions and motion for summary judgment on August 22, 2022, at which point the motions were fully briefed. (Dkts. 62-64.)

On September 30, 2022, Jinn filed a letter motion seeking leave to file an additional video exhibit purportedly depicting "another substantially similar incident of a triggerless discharge of a P320."  (Dkt. 70.)  Sig filed a letter opposing the request the same day, arguing that the video is irrelevant to any argument raised in the pending motions.  (Dkt. 71.)

The *Daubert* motions and motion for summary judgment were referred to me for report and recommendation on January 25, 2023.  (Dkt. 72.)  Because Jinn's letter motion to submit an additional video exhibit bears on the evidence available to the Court in deciding the motion for summary judgment, I have also considered it in this Report and Recommendation.

## LEGAL STANDARDS

### A.    Expert Testimony

Under the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" and render an opinion at trial if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also* Fed. R. Evid. 703 (experts may rely on inadmissible evidence if experts in the particular field would reasonably rely on those kinds of facts or data, but that evidence may be presented to the jury only if its probative value in helping the jury substantially outweighs its prejudicial effect).  Expert opinion is not limited only to scientific subject matter that can be tested by scientific methodology

but extends to "technical or other specialized knowledge."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Pursuant to *Daubert*, the Court acts as "gatekeeper" to ensure that expert opinions pass muster under the rules.  *Amorgianos v. National Railroad Passenger Corp*., 303 F.3d 256, 259 (2d Cir. 2002).  That responsibility requires assessing the expert's qualifications in relation to the subject matter to which he or she will testify and determining whether the testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 119 S. Ct. at 2799.  The Court must employ its gatekeeping function to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  "The proponent of the expert testimony has the burden to establish these admissibility requirements."  *In re Pfizer Inc. Securities Litigation*, 819 F.3d 642, 658 (2d Cir. 2016).

Courts assessing the reliability of expert testimony are instructed to apply a "flexible" analysis, and may, but are not required to, consider the factors identified in *Daubert*, that is, "(1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community."  *Zaremba v. General Motors Corp*., 360 F.3d 355, 358 (2d Cir. 2004) (citing *Kumho Tire*, 526 U.S. at 149-50, 119 S. Ct. at 1175 and *Daubert*, 509 U.S. at 592-94, 113 S. Ct. at 2796-97).  "[T]he trial judge has 'the same kind of latitude in deciding how to test an expert's reliability ... as it enjoys when it decides whether that

expert's relevant testimony is reliable.'" *Id*. at 358 (quoting *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176) (original emphasis omitted).

Even otherwise qualified experts may not simply offer conclusory opinions. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Conclusory opinions are a form of "ipse dixit," and often provide an insufficient basis upon which to assess reliability. *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to find the expert evidence inadmissible. *Id*.

## B.    Summary Judgment

To obtain summary judgment under Rule 56, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a).  The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).  The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."

*Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order). Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

In assessing the record to determine whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513 ("[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). The Court must "eschew credibility assessments." *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal citation marks omitted). However, conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. Summary judgment thus may be granted "where the nonmovant's evidence is conclusory, speculative, or not significantly probative." *Zeno v. Pine Plains Central School District*, No. 07-CV-6508, 2009 WL 1403935, at *2 (S.D.N.Y. May 20, 2009) (citing *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2510-11); see *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.

Ct. 1348, 1356 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

## DISCUSSION

Where challenges to the admissibility of expert testimony are raised concurrently with a motion for summary judgment, "[t]he Court must first decide whether the opinions proffered by the parties' experts are admissible before proceeding with ruling on Defendants' motion for summary judgment." *Bocoum v. Daimler Trucks North America LLC*, No. 17-CV-7636, 2022 WL 902465, at *5 (S.D.N.Y. March 28, 2022) (collecting cases), *reconsideration denied*, 2023 WL 1466597 (S.D.N.Y. Feb. 2, 2023). The Court therefore begins by considering Sig's motions to exclude the expert testimony of Peter Villani and Timothy Hicks and recommends that both be excluded because their opinions are not reliable. The Court next considers Sig's motion for summary judgment and recommends that it be granted. Finally, the Court recommends denial of Jinn's motion to introduce a new video exhibit.

## A.    Expert Witness Peter Villani's Testimony Should Be Excluded

Sig argues that Villani's testimony should be excluded because he is not qualified to opine on firearm design or manufacture, and because his testimony is unreliable. The Court concludes that Villani is not qualified and that, regardless, his opinions are unreliable.

### 1.    Villani's Qualifications And Opinions

Villani has worked as an Operations Officer, Senior Firearms Instructor/Armorer, and Primary Evidence Custodian for the United States Department of Veterans Affairs Police since 2001. He has participated in a number of firearms training courses and has

worked as a Range Manager and salesman for a gun range in the past.  He is a certified armorer for several guns, including the Sig Sauer P320.  (*See* Villani CV.[4])

Plaintiff has proffered two expert reports prepared by Villani.  In his first report, Villani analyzed five P320 pistols, not including the pistol that shot Jinn.  (Villani Rep. at ECF 2.[5])  Villani began with a visual examination of the first four pistols and assigned a percentage condition based on external signs of wear.[6]  (Villani Rep. at ECF 2, 6, 9, 10).  He then "field stripped" each one,[7] made measurements of the dimensions of several components, and observed a variety of purported manufacturing and design defects.  (*See generally* Villani Rep.)  Villani then fired 100 rounds through the first and second pistols, disassembled them again, and observed deposits of gunpowder.  (Villani Rep. at ECF 12.)

Villani identified a number of design and manufacturing defects.  Villani noted that there were inconsistencies in the height of slide caps and that there generally "seemed to be no consistency of dimension between the same parts between all four [P320s]," which he termed a manufacturing defect and speculated could be caused by subcontractors using different formulas in their mold injected metal ("MIM") processes.  (Villani Rep. at ECF 13.)  In all four P320s that he examined, Villani observed that the

---

[4] "Villani CV" refers to the curriculum vitae of Peter Villani, filed at Dkt. 57-7.

[5] "Villani Rep." refers to the expert report of Peter Villani, filed at Dkts. 57-5 and 62-11.

[6] Villani's examination of the fifth pistol was limited to viewing photographs, as it was in evidence in another case.  His examination of the fourth pistol was also circumscribed because it was entered into evidence in a different case.  (Villani Rep. at ECF 2, 10.)

[7] To "field strip" a weapon is to "dismantle or disassemble (a firearm or other piece of equipment), esp[ecially] as one would in the field rather than in a workshop." *Field-strip*, OED Online, Oxford University Press, https://www.oed.com/view/Entry/287186? Redirected From=%22field+strip%22& (accessed April 11, 2023).

MIM components were not "finished to a tighter tolerance" and exhibited rounded areas of excess material, termed "rollover" by Villani, which "prevented full intended contact of the sear and striker overlaps." (Villani Rep. at ECF 13.) Villani opined, inter alia, that the reduced contact between components, "with the addition of minimal movement of the trigger/safety level/safety lock which would cause the safety to be disengaged, could lead to an unintended discharge." (Villani Rep. at ECF 13.) He also noted that Sig had discontinued the use of a safety lever return spring in its current P320 production, which he identified as a manufacturing defect. (Villani Rep. at ECF 13.) He ultimately concluded that because of "the various sizes of internal parts and having a wide range of motion between these parts, I concur with Sig Sauer's own assessment … that 'like any mechanical device,[ ]exposure to acute conditions (e.g. shock, vibration,[ ]heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed.'" (Villani Rep. at ECF 15) (original emphasis omitted).

After Jinn's pistol was recovered from DHS (*see* Dkts. 24), Villani attended Defendant's expert Derrick Watkins's ("Watkins") examination of the pistol and observed it undergoing a computerized tomography ("CT") scan, after which Villani prepared a supplemental expert report. (Villani Supp. Rep. at 2.[8]) Villani observed Watkins conduct function tests and trigger weight tests but declined to do so himself because Watkins "had conducted these tests without issue." (Villani Supp. Rep. at 2.) Villani also observed Watkins conduct a "firing pin hole test" to determine that the striker component of the pistol would function as expected. (Villani Supp. Rep. at 2.)

---

[8] "Villani Supp. Rep." refers to the Report of Jinn Subject Sig Sauer P-320 Semi-Auto Pistol, filed at Dkts. 57-6, 61-8, 67-9, and 68-3.

Villani then observed Watkins conduct several other tests, the results of which he seeks to caveat in his report.  For example:

> Watkins also began testing the [P320] by moving the slide up and down independent of the grip module one hundred times while he counted out loud in an attempt to cause the striker to slip off of the sear without a trigger pull. After counting to one hundred, he then pressed the trigger and it made an audible click which denoted that the striker functioned normally *at that time*. Watkins was unable to determine if the striker foot was "biased" left or right during his slide movement test. The amount of repeated motions needed to cause eventual "walk off" of the striker foot from the sear face cannot be determined, as every instance of discharge occurred after the person injured was carrying their [P320] for an indeterminate amount of time which can cause independent movement between the slide and grip module an unknown hundreds of times on any particular day dependent upon that person's activity and body movement.

(Villani Supp. Rep. at 2) (emphasis in original).

Watkins also removed the slide assembly and attempted to cause the striker to strike a cartridge containing putty without pulling a trigger by "biasing" the striker foot to the left and right while pulling the striker foot rearward and then releasing it.  The putty was not dimpled, indicating that the striker did not strike the cartridge and that the internal safety components prevented the strike without a trigger pull.  (Villani Supp. Rep. at 3.) Villani opines that "[t]his test is inconclusive as Watkins was not able to have the striker fully 'energized' by the sear['s] positive contact surface on a 'bias' to one side or the other (left or right) while the subject pistol was assembled and in a vertical position that most all reported uncommanded discharges had occurred with the [P320]."  (Villani Supp. Rep. at 3.)

Villani observed that Jinn's P320 did not have a safety lever return spring, instead relying on gravity to return the safety lever to the "lowered" position after the pistol is fired. (Villani Supp. Rep. at 3-4.)   The flaw in intentionally omitting this component by Sig, opines Villani, is that when a pistol is held in a vertical position, the safety lever can move

11

outwards, make contact with the safety lock, and push the safety lock upwards, rending it unable to stop the striker from traveling forward.  (Villani Supp. Rep. at 4.)  Villani did not perform any tests or calculations to determine whether and how his theory of safety lever and lock movement would actually occur.  (Villani Dep. at 16-17.[9])

Villani also observed and photographed several MIM components and noted, as he had with the four other P320 pistols he examined, "rollover" (excess material) on the striker foot and a rounded edge on striker stop wall, which he again opines can cause reduced contact between the contact surfaces of the striker foot and sear, allowing the striker to "walk off" the sear, and also allow the safety lock tab to "jump[] over" the striker stop wall. (Villani Supp. Rep. at 5-6.)  In his opinion, these two failures "can … contribute" to an un-commanded discharge.  (Villani Supp. Rep. at 5-6.)  He further observed an off-center "drag mark" on the sear, indicating that the striker is not centered on the sear, which can further reduce the contact and cause misalignment between the striker foot and sear.  (Villani Supp. Rep. at 7.)  This misalignment, Villani opines, could also lead the safety lock tab to fail, in combination with the contact surface issues.  (Villani Supp. Rep. at 8-9.)

Villani concludes "to a reasonable degree of certainty that a combination of the [discussed] defects did create a 'perfect storm' scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the [P320]."  (Villani Supp. Rep. at 14.)  More broadly, "[d]epending upon the condition of the individual [P320] components' status, (sear/striker engagement, excess

---

[9]  "Villani Dep." refers to the March 1, 2022 deposition of Peter Villani, excerpts of which are filed at Dkts. 57-9, 61-11, and 62-8.

molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported designs or manufacturing defects could lead to an uncommanded discharge." (Villani Supp. Rep. at 15.)  Villani did not distinguish between design and manufacturing defects in his Supplemental Report.

### 2.   Mismatch Between Villani's Qualifications And Opinions

Sig first argues that Villani's testimony should be excluded because he is not qualified to opine on firearm design or manufacturing.  While Villani is certified as an armorer on the P320, this certification merely allows him to disassemble and reassemble a gun and identify parts that need to be repaired or replaced; his opinions on the presence of defects in design and shortcomings of the manufacturing process are outside the scope of his expertise.  (Def. Villani Mem. at 12-13.[10])  Jinn counters that Villani's experience as an armorer on the P320 and his "vast experience with firearms" constitute "specialized expertise" that qualifies him as an expert.  (Pl. Mem. at 3-5.[11])

Both parties emphasize the holdings of other courts either admitting or excluding Villani's testimony, particularly *Guay v. Sig Sauer, Inc.*, 610 F. Supp.3d 423 (D.N.H. 2022) (admitting the testimony of both Villani and Hicks, and favored by Jinn), and *Frankenberry v. Sig Sauer*, No. 4:19-CV-02990 (D.S.C. Feb. 4, 2022) (excluding Villani, and favored by Sig).[12]  (*See*, *e.g.*, Pl. Mem at 3-5; Def. Villani Mem. at 12.)  After the motions were fully

---

[10] "Def. Villani Mem." refers to Sig's Memorandum Of Law In Support Of Sig Sauer, Inc.'s Motion To Exclude Evidence And Opinions Of Plaintiff's Expert, Peter Villani at Dkt. 57.

[11] "Pl. Mem." refers to Jinn's Memorandum In Opposition To Defendant's Motion To Exclude Plaintiff's Experts Peter Villani And Timothy Hicks at Dkt. 67.

[12] The *Frankenberry* decision is filed in this case at Dkt. 57-2.

briefed, the Western District of Kentucky issued its opinion in *Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146 (W.D. Ky. March 29, 2023) excluding both Villani and Hicks.[13]

As to Villani's qualifications, the District of New Hampshire in *Guay* held that "Villani is qualified on the basis of his experience to opine about subjects such as the proper functioning of firearms and the condition of their internal components, firearms care, and conditions that make firearms unsafe." *Guay*, 610 F. Supp.3d at 429. In coming to that conclusion, the *Guay* court found that Villani's report (which was also produced as his first report in this case) "discusses the pistols that he disassembled and how he found what he perceived to be worn or damaged parts." *Id*. at 430. The *Guay* court did, however, note the limited scope of Villani's qualifications, holding that "although Villani has sufficient experience to opine about what he saw and what he concluded when he conducted his examinations … he does not have sufficient experience to opine about the mold or casting process and whether a machining process would have prevented the problems he identified." *Id*.

In contrast, the District of South Carolina in *Frankenberry* found that Villani was entirely unqualified to opine about the alleged manufacturing defects because "Villani's opinions regarding manufacturing defects extend beyond the scope of an armorer" and fall outside the scope of his knowledge, skill, experience, education, and training. *Frankenberry*, at 9. The court in *Mayes* similarly held that Villani's firearms experience did not qualify him to testify as to "whether the cause of a problem is in fact a design or manufacturing defect." *Mayes*, at 9-10.

---

[13] The *Mayes* decision is filed in this case at Dkt. 73-1.

Here, the Court comes to a similar conclusion about Villani's qualifications as the courts did in *Frankenberry* and *Mayes*.[14]   Villani's experience as an armorer and with firearms in general would qualify him to opine about the functioning of firearms generally and the conditions of their components.   But his opinions in this case go much further than "discuss[ing] the pistols that he disassembled and how he found what he perceived to be worn or damaged parts."   *Guay*, 610 F. Supp.3d at 430.   Instead, he purports to identify design flaws and manufacturing defects that would make even a brand new pistol unsafe for use, concludes that those flaws in fact caused Jinn's pistol to fire without a trigger pull, and implies that changes to the design and manufacturing process would make the pistol safer.

Nothing in Villani's qualifications or the content of his report suggests he has any expertise "that enables him to identify whether the cause of a problem is in fact a design or manufacturing defect versus damage from ordinary use or misuse by the owner of the gun," *Mayes*, at 10, or to determine what effect any observed defects would have on the function of the gun.   Villani does not claim to have ever evaluated or observed the result of a defective or misaligned firearm component, except in this and other cases in which

---

[14] Jinn makes much of the fact that the *Guay* court held an evidentiary hearing, while the *Frankenberry* court did not, to argue that the Court should give the *Guay* opinion more credence.   (Pl. Mem. at 3-4, 10.)   But "[n]othing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion."   *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp.2d 53, 71 (S.D.N.Y. 2001).   Nor has Jinn requested an evidentiary hearing in this case.   Jinn identifies no factual issues in either *Frankenberry* or the present action that would have made an evidentiary hearing necessary, making this point unpersuasive.   *See Id.* at 70-71 (evidentiary hearing not required where parties did not request it and the court's decision turned on whether, as a matter of law, an expert's opinion was reliable).   And, given the multiple deficiencies set forth above, the Court does not see how such a hearing would further the analysis.

he served as an expert.  While he may be able to disassemble a pistol, identify its parts, and ascertain if parts need to be replaced, Villani does not explain how that experience qualifies him to determine the consequences to a gun's function that result from any damage or defect.  Villani also has no experience in product design or manufacturing, as all three courts to consider his testimony have concluded and Villani concedes.  (Villani *Guay* Dep. at 57-60.[15])

Other courts similarly have found that an expert's qualifications about various aspects of a device does not make that person an expert in design or design defects with respect to that device.  For example, in *Karavitis v. Makita U.S.A., Inc.*, 722 F. App'x 53 (2d Cir. 2018), the Second Circuit affirmed the District Court's decision that a purported expert in safety engineering who had some experience with circular saws was not qualified to opine on whether a circular saw was defective and whether a defect caused the plaintiff's injury because, inter alia, he "failed to explain the relevance of those credentials" to his opinions.  722 F. App'x at 55.  In *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp.2d 537 (S.D.N.Y. 2005), the court held that a purported expert with "extensive experience and expertise" in the history of cycling, cycling trends, and cycling safety nonetheless was not qualified to opine on bicycle design or engineering, or what caused the plaintiff's bicycle's frame to break because those topics were outside the scope of his expertise.  376 F. Supp.2d at 552-565.  And in *Pierre v. Hilton Rose Hall Resort & Spa*,

---

[15] "Villani *Guay* Dep." refers to the transcript of the March 1, 2022 deposition of Peter Villani conducted in *Guay v. Sig Sauer, Inc.*, excerpts of which are filed at Dkts. 57-8, 61-9, 62-4, and 67-10.  Defendant represents that "[b]y agreement of counsel, Sig Sauer conducted one full deposition of Villani in *Guay v. Sig Sauer, Inc.* regarding his overall opinions of alleged defects in the P320 pistol and his qualifications."  (Def. Villani Mem. at 4 n.3.)

No. 14-CV-3790, 2016 WL 1228604 (E.D.N.Y. March 28, 2016), the court held that a purported expert, while perhaps "entirely qualified to offer testimony on whether a particular pool or waterslide was built to predetermined specifications," was unqualified to opine on pool and waterslide design and whether a particular design caused the plaintiff's injuries because, despite his "25-year career in the pool industry, he has never: (1) designed any structural specifications for pools; (2) designed any structural specifications for waterslides; or (3) approved any pool-design or pool-construction drawings … [a]t best, his qualifications [were] limited to physically building a pool, a different task than designing a pool or a waterslide." 2016 WL 1228604, at *4. Here too, Villani has not demonstrated how his experience in disassembling, reassembling, and replacing worn parts in firearms, while extensive, qualifies him to opine on either firearm design or manufacturing, or the causal connection between observed purported defects and Jinn's accident.

As found in *Frankenberry* and *Mayes*, and consistent with Second Circuit case law, Villani's qualifications are insufficient to sustain his offering opinions both on whether the P320 is defectively designed or manufactured and on whether any purported defect or combination of defects caused Jinn's accident.

### 3.    Villani's Opinions Are Unreliable

Even if Villani were qualified to opine on firearm design and manufacture, his opinions would still need to be sufficiently reliable in order to be admissible. Sig argues that because Villani's opinions rest on ipse dixit and fail to satisfy even one of the *Daubert* factors, they are unreliable and thus inadmissible. (*See* Def. Villani Mem. at 14-19.) Jinn responds that Villani's methodology of photographing and measuring exemplar pistols

and Jinn's P320, combined with Villani's review of documented "real life" replications of discharges of P320 pistols without a trigger pull, render his opinions sufficiently reliable. The Court finds that Villani's opinions are insufficiently reliable to pass muster under Fed. R. Evid. 402 and *Daubert.*

Jinn seeks to have Villani qualified based on his experience, rather than based on any scientific testing.   But even where an expert is qualified based on specialized experience, the expert must still "have based that opinion on sufficient facts or data, and 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts, because the trial court's gatekeeping function requires more than simply taking the expert's word for it.'"  *Emig v. Electrolux Home Products Inc.*, No. 06-CV-4791, 2008 WL 4200988, at *8 (S.D.N.Y. Sept. 11, 2008) (internal quotation marks omitted).   As noted above, Villani has not explained how his experience with firearms qualifies him to opine on design, manufacture, and causation.   Nor has he based his opinions on sufficient facts or data, or reliably applied any experience to the facts.

To begin, Villani insists that the rollover in various components decreased the contact between parts enough that it caused them to lose engagement and the internal safety mechanisms of the pistol to fail, and that without the rollover, other identified defects would likely not be enough to cause the pistol to fire without a trigger pull.  (Villani Dep. at 22.)  But Villani has not quantified the amount of rollover and "ha[s] no idea" how he would do so.  (Villani *Guay* Dep. at 97.)  Villani stated that "[y]ou can just visually tell that [the rollover on the striker is] higher than the contact surface of the sear," but "can't even estimate" how much excess material is present.  (Villani *Guay* Dep. at 97-98.)  But

Villani did not review any analysis of how excess material could or could not affect the ability of the striker foot and sear to maintain contact; nor did he conduct any modeling, analysis, or testing to support his theory.  (Villani *Guay* Dep. at 100-02; Villani Dep. at 16-17.)

Courts in this District have excluded experts under similar circumstances for a lack of reliability.  For example, in *Tramontane v. Home Depot U.S.A., Inc.*, No. 15-CV-8528, 2018 WL 4572254 (S.D.N.Y. Sept. 24, 2018), the plaintiff's expert was excluded where "he examined the fractured 'J' hooks and found 'considerable casting porosity', [and] then simply conclude[d] that such porosity constitutes a defect which caused the fracture, and therefore caused Plaintiff's injuries" while "provid[ing] no data upon which to rest this conclusion."  2018 WL 4572254, at *6.  Because the expert "faile[d] to illuminate whether porosity at any level is problematic, and if so, at what point it constitutes a defect," his opinion was "impermissibly based on his *ipse dixit* alone" and thus unreliable.  *Id.*

Here too, Villani examined the pistol, found rollover, and concluded that it was a defect that caused Jinn's injury without any data to support the conclusion; his opinion is similarly based on his ipse dixit alone and should be excluded.  *See also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (affirming exclusion of expert who opined that a drug caused plaintiff's husband's cirrhosis because the expert "was unable to point to any studies or, for that matter, anything else that suggested that cirrhosis could be caused or exacerbated by Rezulin"); *Russo v. Keough's Turn of the River Hardware, LLC*, No. 11-CV-994, 2012 WL 4466626, at *4 (S.D.N.Y. Sept. 25, 2012) ("Essentially, Dr. Marletta opines that the non-uniform thickness of the metal ladder rails is a manufacturing defect and caused the ladder's collapse, but provides no reasoning or any

point of comparison indicating why the non-uniform thickness constitutes a manufacturing defect. In the absence of any support behind his assumption that the non-uniform thickness constituted a defect, Dr. Marletta's opinion is speculative at best"); *accord Mayes*, at 17 ("both experts opine that a raised surface on the interface between components of the gun **could** result in an uncommanded discharge in theory. But neither [expert] offers any evidence suggesting that such an uncommanded discharge occurs generally or that it did in this case. [The plaintiff] has offered the bare hypotheses of both Hicks and Villani, which fall short of admissibility") (emphasis in original); *Frankenberry*, at 11 (finding Villani's opinions unreliable because "as to Villani's 'rollover' theory, he has not confirmed that this condition could cause components that are engaged … to lose that engagement without a trigger pull").

The lack of foundation in his experience and knowledge of Villani's opinions could have perhaps been cured by testing of his theories, but Villani conducted no such testing. "In design defect cases, testing, although not an absolute [prerequisite] for expert testimony to be admissible, is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work." *Karnauskas v. Columbia Sussex Corp.*, No. 09-CV-7104, 2012 WL 234377, at *8 (S.D.N.Y. Jan. 24, 2012) (internal quotation marks and brackets omitted). Courts thus "have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested."[16] *Kass v. West Bend Co.*, No. 02-CV-3719, 2004 WL 2475606, at *6 (E.D.N.Y.

---

[16] In urging the Court to adopt the *Guay* court's holding, Jinn ignores that it rested partially on the conclusion that "[i]n the First Circuit … whether Villani's theory is confirmed by specific testing does not necessarily make it inadmissible; rather, it makes it susceptible to cross-examination by Sig Sauer and rebuttal by Sig Sauer's own experts." *Guay*, 610

Nov. 4, 2004), *aff'd*, 158 F. App'x 352 (2d Cir. 2005); *see*, *e.g.*, *Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 207 (2d Cir. 2010) ("the district court was not required to accept [plaintiff's expert's] testimony regarding his speculative and untested theories regarding the cause of [plaintiff's] accident"); *Sanders v. Fireline, Inc.*, 295 F. App'x 373, 375 (2d Cir. 2008) (where "the expert's report and deposition testimony reflect a failure on his part to make any effort to validate through scientific methodology the hypotheses ... as to why the [product] was defective because of its manufacture or design … [i]t was well within the court's discretion to conclude that there was simply too great an analytical gap between the data and the opinion proffered" to admit the expert's testimony) (internal quotation marks, citations, and brackets omitted); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (affirming exclusion of testimony in products liability case where expert did not attempt to reconstruct the accident or test his theory because "[t]he failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony").

Jinn asserts that any testing would have put his experts' lives at risk.  (*See* Pl. Mem. at 19.)  That proposition is somewhat belied by the testing performed by Sig's expert, who used a cartridge loaded with putty to test whether the lateral movement of the slide assembly identified by Villani could cause the gun's internal safety mechanisms to fail (Villani Supp. Rep. at 2-3), as well as vibration testing performed by Sig Sauer purporting to demonstrate that the P320 is incapable of firing without a trigger pull.  (*See*

---

F. Supp.3d at 431.  In contrast, in the Second Circuit, "a trial court should not abandon its gatekeeping role and rely only upon cross-examination to expose any flaws in a proposed expert's testimony where the expert's methodology is untestable."  *BS Big V, LLC v. Philadelphia Indemnity Insurance Co.*, No. 19-CV-4273, 2022 WL 4281481, at *8 (S.D.N.Y. Aug. 5, 2022) (internal quotation marks and citation omitted), *R. & R. adopted*, 2022 WL 4181823 (S.D.N.Y. Sept. 13, 2022).

Def. Villani Reply at 6;[17] Dkt. 62-13.)  While criticizing that testing for not capturing the combination of **all** the conditions theorized to cause an un-commanded discharge, Villani did no testing as to **any** of the several alleged defects about which he opines.

Jinn also argues that testing is not necessary because videos of other allegedly similar incidents of triggerless discharges of P320s corroborate his theories.[18]  (Pl. Mem. at 27-28, citing Pl. 56.1 Statement Exs. 6-11.)  In two of the videos, the gun is not visible when it fires, making it impossible to determine whether the trigger was pulled.[19]  None of the incidents in the videos occur in similar situations to Jinn's accident.[20]  Even the videos in which the pistol is visible do not allow for a viewer to determine if anything other

---

[17] "Def. Villani Reply" refers to Sig Sauer, Inc.'s Reply In Support Of Its Motion To Exclude Evidence And Opinions Of Plaintiff's Expert, Peter Villani at Dkt. 62.

[18] It is unclear exactly which of the videos Villani relied on in forming his opinion that the "uncommanded discharge" of Jinn's pistol "is consistent with many other uncommanded discharges of [P320s] resulting in similar injuries" (Villani Supp. Rep. at 1) and that the defects identified in his report "led to a triggerless discharge … as in many other cases involving the [P320]." (Villani Supp. Rep. at 14.)  Jinn provides excerpts of Villani's deposition testimony discussing screenshots from two of the videos provided as exhibits to Jinn's opposition to summary judgment.  (Villani *Guay* Dep. at 145-48, discussing the videos filed as Pl. 56.1 Statement Exs. 8-9.)  No matter which videos he relied on, none provide an acceptable substitute for testing his theories of design defect and causation.

[19] The "Roscommon video" (Pl. 56.1 Statement Ex. 5) is footage from an officer's body camera; when the officer's pistol discharges it is not visible on the video.  The "SEPTA video" ( Pl. 56.1 Statement Ex. 7) begins after the discharge occurs, and the only indication of the circumstances of the discharge is the officer's statement in the video that his gun was holstered when it fired.

[20] Jinn asserts that the videos show similar un-commanded discharges because they occurred while the gun was holstered and without the user pulling the trigger. But the accidental discharges depicted occurred while the victims were getting out of a car (Pl. 56.1 Statement Exs. 5, 8), while standing with a hand outside of the holster (Pl. 56.1 Statement Ex. 4), or while placing a handbag carrying the pistol on a casino table.  (Pl. 56.1 Statement Ex. 11.)  None of the videos depict a P320 firing while the user attempted to draw it from a holster.

than a person's finger pulled the trigger.[21]  Nor do they allow a viewer to discern whether the pistols in the videos had the same "defects" as in Jinn's, if those "defects" caused the discharges, or if the pistols were in the same condition and working order.  Further, Jinn has offered no testimony from anyone with personal knowledge of the videos or the incidents depicted to authenticate the videos.  The leap from the unauthenticated videos, allegedly depicting triggerless discharges of other P320s in different situations, to Villani's conclusions that Jinn's P320 was defective and that those defects caused his accident in particular, is too far for this Court to find Villani's opinions reliable.  *See Amorgianos*, 303 F.3d at 270 ("district court did not abuse its discretion in excluding [expert's] testimony upon reasonably concluding that the analytical gap between the studies on which she relied [that involved different solvents and exposures than those at issue in plaintiff's case] and her conclusions was simply too great and that her opinion was thus unreliable").

Villani suggests that testing his hypothesis would be virtually impossible.[22]  (Villani Supp. Rep. at 2.)   But that only demonstrates that his opinions have no reliable

---

[21] Sig points out that an investigation into the Roscommon incident concluded that a seatbelt buckle made its way into the holster.  (Def. Reply (Dkt. 63) at 6, citing Dkts. 63-8, 9, 10.)

[22] Villani claims that "[t]he amount of repeated motions needed to cause eventual 'walk off' of the striker foot from the sear face cannot be determined, as every instance of discharge occurred after the person injured was carrying their P-320 for an indeterminate amount of time which can cause independent movement between the slide and the grip module an *unknown* hundreds of times on any particular day."  (Villani Supp. Rep. at 2 (emphasis in original).)  Jinn similarly contends in his Rule 56.1 Statement that "any attempt to replicate a trigger-less discharge of the P320 would require employing a robot wearing a P320 on its hip and walking on a treadmill for months, if not longer, to accurately simulate real-world carrying conditions, i.e., an agent walking with a holstered P320 for a long period of time with intervening breaks, during which the flawed striker-sear connection is subject to daily inertial vibrations and impacts which gradually separate that spring-charged connection to the point of failure."  (Pl. 56.1 Statement ¶ 17.)

foundation.  To be sure, testing is not an absolute.  But whether a theory has been tested and is capable of being tested are important considerations in the *Daubert* analysis; the apparent inability for Villani's theory of defects and causation to be tested renders his opinions too unreliable to be admissible.  *See Faryniarz v. Nike, Inc.*, No. 00-CV-2623, 2002 WL 1968351, at *3 (S.D.N.Y. Aug. 23, 2002) ("According to [the expert's] own statements, his conclusions regarding causation are incapable of being tested or challenged. This is precisely the type of evidence Rule 702 was intended to exclude"); *see also Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp.3d 401, 420 (S.D.N.Y. 2016) (excluding testimony of expert whose report "read[] more like a series of subjective observations than a scientific analysis" that could be tested); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp.2d 175, 190 (D. Conn. 2009) (excluding opinion of expert environmental chemist whose "methods and opinions are not capable of being tested or verified").

Without any testing, and without any other data or analysis to support his theories that the conditions observed rendered Jinn's pistol defective and caused his accident, Villani's opinion does not pass the threshold for admissibility.  See *Lynch*, 374 F. App'x at 206 (affirming exclusion of the testimony of an expert who "repeatedly declined to offer any quantitative or scientifically-based testimony regarding his theory of how both forks failed. Instead, without performing any testing, [the expert] testified to how the failure 'could have happened'"); *Doe v. American Medical Systems, Inc.*, 96 F. App'x 758, 759 (2d Cir. 2004) (affirming exclusion of expert who "reached [his] conclusions through examination and extrapolation unsupported by expert qualifications and by ignoring alternative explanations").

In addition to the lack of analysis supporting his rollover theory, Villani also does not tie his causation opinions sufficiently to the facts of this case.  Villani's opinions are based on his observation of Jinn's pistol and counsel's explanation of how the accident occurred; he did not speak to Jinn or anyone who witnessed the accident, nor did he review any materials related to the incident, including DHS's report following the accident.  (Villani Dep. at 7, 10-11.)  Villani also did not examine Jinn's holster, beyond viewing two largely illegible photographs.  (Villani Dep. at 17.)  Villani concludes that a combination of observed defects "did create a 'perfect storm' scenario which led to a triggerless discharge" (Villani Supp. Rep. at 14) but conceded that "[y]ou just can't tell" what combination of possible misalignments identified in his report were in fact present to cause Jinn's accident.  (Villani Dep. at 21.)  Villani's failure to engage with and consider the circumstances of Jinn's accident further renders his opinions unreliable.  *See Tramontane*, 2018 WL 4572254, at *7 (S.D.N.Y. Sept. 24, 2018) ("Otherwise detrimental to [the expert's] analysis is his scant overview of the facts of this case and how they pertain to his conclusion").

Also problematic is Villani's failure to identify and analyze a feasible alternative design.  *See Rypkema v. Time Manufacturing Co.*, 263 F. Supp.2d 687, 693 (S.D.N.Y. 2003) ("[T]o advance a reliable hypothesis, an expert is required to ascertain feasibility, to test alternative designs, and to address the engineering factors and tradeoffs that go into the design of a product for distribution in the marketplace").  Villani does not explicitly identify a feasible alternative design, though the Court might infer that an alternative design would be one that omits all identified defects.  But Villani performed no testing or calculations and offers no more than his own assurances to support the implication that

remedying the identified defects, such as through secondary machining of MIM parts and the reintroduction of the safety return spring, would actually reduce the likelihood of a triggerless discharge.  Nor does Villani (or Jinn's counsel) make any attempt to compare the utility and costs of any proposed alternative design to that of the existing design, which is necessary to prevail on a design defect claim under New York law.  *See Zaremba*, 360 F.3d at 358 ("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests") (collecting cases); *Zsa Zsa Jewels, Inc. v. BMW of North America, LLC*, 419 F. Supp.3d 490, 516 (E.D.N.Y. 1019) ("For [plaintiff's expert's] conclusion that Defendant's design choices were 'defective' to be admissible, [the expert] would have been required to consider the magnitude and severity of any safety risks and the concomitant utility or benefits of the design vis-à-vis the available alternatives, all in accordance with what it means for a specific product design to be 'defective' under New York law"); *Colon*, 199 F. Supp.2d at 77 ("The presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit").  To overcome this shortfall, Jinn offers an alternative design in his briefing – the addition of an external safety.  (Pl. SJ Mem. at 9-10;[23] Pl. 56.1 Statement at ¶ 16.)  But neither of Jinn's experts (or his counsel) analyze either the feasibility or efficacy of this purported alternative.

---

[23] "Pl. SJ Mem." refers to Jinn's Memorandum In Opposition To Defendant's Motion For Summary Judgment at Dkt. 69.

In the words of one court that are equally applicable here:  "having performed no meaningful tests or calculations … or otherwise having conducted any meaningful comparison of the cost versus utility of an alternative design theory, there is little question that [the expert's] theories and conclusions are supported only by his thin assertions which themselves amount to little more than speculation and conjecture" which "falls far short of meeting the standards outlined in *Daubert* and Rule 702."  *Lara v. Delta International Machinery Corp.*, 174 F. Supp.3d 719, 737 (E.D.N.Y. 2016).  Villani fails to "bridge the logical gap between [the] facts" of his observations and "his conclusion" that the observed conditions of Jinn's P320 constitute product defects which caused Jinn's injury.  *Bocoum*, 2022 WL 902465, at *12.  "This is precisely the type of opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, which courts have held inadmissible under Rule 702 and *Daubert*," and so should be excluded.[24]  *Id*.

**B.    Expert Witness Timothy Hicks's Testimony Should Be Excluded**

As with Villani, Sig argues that Hicks's testimony should be excluded because he is not qualified to opine on firearm design or manufacture, and because his testimony is unreliable.  The Court concludes that regardless of whether Hicks is qualified, his opinions are nonetheless unreliable and should be excluded.

---

[24] Although identifying some observed conditions as "manufacturing defects" in his first report, Villani does not appear to offer any opinion that Jinn's pistol had manufacturing defects, as distinct from design defects.  Nor could he; Villani does not make any attempt to compare Jinn's pistol to any design specifications or other P320s to identify a variance from the governing product design.

### 1.      Hicks's Qualifications And Opinions

Hicks is a Professional Engineer licensed in five states and is a member of several professional associations.  (Hicks CV at 3.[25])  He has a background in mechanical design and system evaluations, including accident reconstruction, and has "spent close to 20 years … in the automotive industry, responsible for the design, manufacturing, testing, and validation of vehicle systems."  (Hicks Rep. at 1.[26])  He earned a Bachelor of Science in Mechanical Engineering from Michigan Technological University and a Master of Science in Engineering Sciences from Rensselaer Polytechnic Institute.  (Hicks CV at 2.)  He also holds Certificates of Eligibility from the California Department of Justice Bureau of Firearms and Massachusetts Firearms Records Bureau for performing firearm certification testing.  (Hicks Rep. at 1.)

In forming his opinions, Hicks relied on the testing performed by Sig's expert, CT scans, and Villani's observations and photographs.  (Hicks Rep. at 2.)  Hicks did not attend or participate in the testing and examination of Jinn's P320; nor did he contribute to the examination or testing process.  (Hicks Rep. at 2, 9; Hicks Dep. at 36-38.[27])  Hicks did not speak with Jinn and read only two pages of his deposition.  (Hicks Dep. at 21.)  Hicks identifies essentially the same defects as Villani, without explicitly differentiating between design and manufacturing defects, and opines that "[t]hese defects explain

---

[25] "Hicks CV" refers to the curriculum vitae of Timothy M. Hicks, P.E., filed at Dkts. 59-5 and 63-5.

[26] "Hicks Rep." refers to the November 15, 2021 Report of Timothy M. Hicks, P.E., filed at Dkts. 59-4, 61-6, 63-11, 67-7, and 69-5.

[27] "Hicks Dep." refers to the transcript of the March 10, 2022 Deposition of Timothy M. Hicks, P.E., excerpts of which are filed at Dkts. 59-7 and 67-6.

Special Agent Jinn's report of un-commanded (no trigger pull) discharge of the firearm." (Hicks Rep. at 3-7.)

Hicks describes the process for firearm certification testing in California and Massachusetts and notes that the P320 is listed on the Massachusetts approved firearm roster but not that of California.  (Hicks Rep. at 8.)  Hicks notes that "[a] critical portion of any investigation is to inspect the component parts and equipment involved" and lists American Society for Testing and Materials publications that provide guidance in different inspections, but he does not represent that he relied on or applied this guidance in forming his opinions.  (Hicks Rep. at 8.)  Hicks further represents that if called upon to testify he will rely on an animation/simulation of the P320 based on "computerized tomography and/or high-resolution photographs" that is "ongoing" but does not further describe how that animation is being prepared nor further discuss its contents.  (Hicks Rep. at 9.)

Hicks concludes, with "a reasonable degree of scientific and engineering certainty … based on engineering education, experience, and training, as well as the work conducted to date and the information available at this time" that "the physical evidence supports [Jinn's] description of the circumstances of his accident" and that "[n]ormal and expected movement and vibration while holstered can cause an accidental discharge given the defective conditions described."  (Hicks Rep. at 11.)

### 2.    Whether Hicks Is Qualified

Sig argues that Hicks is unqualified because his experience is limited to the automotive industry, he has never been involved in the design or manufacture of a firearm, is not a gunsmith, and his certification for testing firearms in California does not require knowledge of the internal design or manufacture of components of firearms.  (Def.

Hicks Mem. at 3.[28])  Jinn contends that Hicks "has significant experience with firearms investigations, functions, and testing" that qualify him to testify in this case.  (Pl. Mem. at 12.)

There is some support for finding Hicks qualified.  "[I]n the context of products liability, an expert need not be confined to his area of practice."  *Nemes v. Dick's Sporting Goods, Inc.*, No. 17-CV-1688, 2019 WL 3982212, at *3 (S.D.N.Y. Aug. 23, 2019) (hereinafter *Nemes I*) (holding that professional mechanical engineer who worked on industrial, facilities, and machine process safety for over two decades was qualified to opine on crossbow design).  "Where an expert has the education or background to permit him to analyze a given set of circumstances, he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture."  *Lappe v. American Honda Motor Co., Inc.*, 857 F. Supp. 222, 226-27 (N.D.N.Y. 1994) (internal quotation marks omitted), *aff'd sub nom*. *Lappe v. Honda Motor Co. Ltd. of Japan*, 101 F.3d 682 (2d Cir. 1996).

Hicks has education and experience as a professional engineer involved in design, manufacturing, system evaluations, and accident reconstruction in the automobile industry, as well as state firearms certifications.  He has some experience with MIM components used in shock absorbers in vehicles.  (Hicks *Mayes* Dep. at 226.[29])  The

---

[28] "Def. Hicks Mem." refers to Sig's Memorandum Of Law In Support Of Sig Sauer, Inc.'s Motion To Exclude Evidence And Opinions Of Plaintiff's Expert Timothy Hicks at Dkt. 59.

[29] "Hicks *Mayes* Dep." refers to the transcript of the March 9, 2022 deposition of Timothy M. Hicks conducted in *Mayes v. Sig Sauer Inc.*, filed at Dkts. 59-6, 63-4, and 67-6. According to Sig, "Hicks has offered the same opinions in three matters pending against

*Guay* court concluded the Hicks was qualified to opine on gun design and manufacturing because "Hicks is a mechanical engineer with substantial experience, and he specializes in the technicalities of product performance and failure," that "his training and experience provide a basis for expertise in the mechanical workings of a product, including a gun," that "Hicks has specific training and experience with gun design and components even if the bulk of his experience is in the automotive industry," and finally that "there is no indication that mechanics of guns are so specialized that a person requires a lifetime of experience specifically with guns or a particular gun to be able to opine about its design or manufacturing flaws." *Guay* 610 F. Supp.3d at 433.  The *Mayes* Court similarly found that "Hicks' wide breadth of engineering experience and capabilities demonstrate that … he is competent to offer opinions on a variety of mechanical topics, including the mechanics of the pistol at issue" and that his relative lack of firearms experience is "more suitably addressed at cross-examination."  *Mayes* at 5-6 (internal quotation marks and citations omitted).

On the other hand, in support of Sig's position, a number of courts in the Second Circuit have found engineers unqualified where their experience was too remote from the issue at hand, even if they had product design and manufacture experience.  *See*, *e.g.*, *Quintanilla v. Komori America Corp.*, No. 07-2375-CV, 2009 WL 320186, at *1 (2d Cir. Feb. 10, 2009) (affirming exclusion of expert as unqualified because, "[t]hough he [did] have experience in the mechanical design of certain specific mechanisms (including power conversion systems, commercial telephone equipment, and a variety of other

---

Sig Sauer: this matter, *Guay v. Sig Sauer, Inc.*, and *Mayes v. Sig Sauer, Inc.*  Hicks was deposed in each case on March 9-10, 2022 and offered testimony that applies equally across all three cases."  (Def. Hicks Mem. at 3 n.2.)

mechanisms), there is no indication that [the expert's] work involve[d] machines that are in any way similar to printing presses" at issue in the litigation) (summary order); *American Medical Systems, Inc.*, 96 F. App'x at 759 (affirming exclusion of expert in medical device products liability case who "ha[d] substantial engineering credentials" but did not have expertise in medical devices); *cf. Zaremba*, 360 F.3d at 359 (suggesting an expert was unqualified to opine on automobile design where "his only practical experience was in designing parts for automobile air bags"); *Smith v. Herman Miller, Inc.*, No. CV-03-5358, 2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005) (questioning the qualifications of an engineer with the "bulk of his experience … in marine engineering and building construction" to opine on the design of a chair where "there is no evidence that [he] ha[d] ever designed furniture, studied furniture design, published papers or lectured on the subject, or worked for a company that designed furniture").

Additionally, while finding Hicks qualified, the *Guay* court appears to have overstated Hicks's firearms experience.  The firearms certification testing he conducts is limited to firing 600 rounds through firearms, field stripping to observe the effects of firing those rounds on the gun, and drop-testing; none of which Hicks did in this case.  (Hicks *Mayes* Dep. at 57-59; *see* Hicks Rep. at 2 (describing methodology).)  To this Court, Hicks's firearms experience falls short of the "specific training and experience with gun design and components" identified by the *Guay* court.  *Guay*, 610 F. Supp.3d at 433.

The Court remains dubious about Hicks's qualifications to opine about the issues in this case.  The Court need not, however, resolve the issue.  Regardless of whether Hicks is qualified, his opinions, like Villani's, are not sufficiently reliable to be admitted under Fed. R. Evid. 402 and *Daubert*.

### 3.    Hicks's Opinions Are Unreliable

Hicks's methodology suffers from the similar defects as Villani's.  He jumps from observing purported defects in the photographs and CT scans of the pistol to the conclusion that those defects could and did cause Jinn's pistol to fire without him pulling the trigger.  (*See* Hicks Rep. at 3-8, 11.)  Hicks took no measurements himself and performed no calculations of, *e.g.*, the force needed to cause the striker to "walk off" the sear or the safety lock to move out of position.  (Hicks *Mayes* Dep. at 117.)  Like Villani, Hicks opined that it would be prohibitively difficult to test all circumstances that could cause a triggerless discharge, and although noting that drop testing may be a useful proxy, he performed no such test.  (*See* Hicks *Mayes* Dep. at 74-75; Hicks Dep. at 38.)

Hicks also relied on videos of other allegedly similar incidents as a substitute for testing.  (Hicks Dep. at 101-02, 168; Hicks *Mayes* Dep. at 234.)  Hicks acknowledges that he has not spoken to or read statements of anyone involved in all or most of the other incidents, and that he has not inspected any of the pistols involved.  (Hicks Dep. at 103-04.[30])  Further, Hicks did not speak with Jinn or other witnesses or review the DHS report of the accident to understand the circumstances leading up to Jinn's accident.  (Hicks Dep. at 20-22.)  Nor does Hicks explicitly propose an alternative design, let alone model or test one.  And to the extent any of the defects could be manufacturing defects, rather than design defects, Hicks does not compare Jinn's P320 to a design specification or non-defective P320.  For all the same reasons discussed regarding Villani's opinions

---

[30] Jinn's counsel objected to the question regarding inspection of the other pistols as "argumentative in that there's no way Mr. Hicks would have been able to procure any of those weapons for an inspection."  (Hicks Dep. at 103.)

above, this lack of analysis, testing, calculations, or modeling renders Hicks's testimony unreliable, regardless of his qualifications.[31]

Hicks attempts to gain support for his opinion by invoking the *Daubert* factor that an expert apply a methodology accepted in the scientific community. Hicks states in his report that "his investigation methods are in accordance with the generally accepted standards and practices of his field, including utilizing the scientific method." (Hicks Rep. at 1.) The Court does not agree. "There is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis." *Colon*, 199 F. Supp.2d at 78. While Hicks "insists in his report that he applied the scientific method in reaching his conclusions, it is … clear that this was not the case," contrary to his engineering training. *Zsa Zsa Jewels*, 419 F. Supp.3d at 515 (excluding testimony of expert whose one experiment did not "logically support the inference [the product at issue] is 'defective,' a judgment which … requires an appreciation of the gravity and severity of the risk and a balancing of those risks with the product's inherent usefulness," did not establish the "the actual cause" of the accident, and who failed to "convey how he eliminated other hypotheses regarding the cause of the accident" or "even considered other hypotheses in the first place"); *accord Lara*, 174 F. Supp.3d at 737 ("Without properly testing his

---

[31] The *Guay* court found that Hicks's opinions in that case were grounded in his observations and measurements, including CT scans, of the guns at issue, and so were not inappropriately based on his ipse dixit, and that his experiences with manufacturing processes would allow him to explain the consequences of machined versus unmachined parts to a jury. *Guay*, 610 F. Supp.3d at 433-34. This Court, like the court in *Mayes*, respectfully disagrees that there is anything (other than his own speculation) to link Hicks's review of photographs and CT scans to his conclusions that i) there are product defects present; ii) these defects could cause the internal safety mechanisms of the guns to fail; and iii) they caused Jinn's pistol to fire without the trigger being pulled. *See Mayes* at 16-17.

alternative theory, [plaintiff's expert's] ultimate conclusions are bottomed upon nothing more than mere speculation and guesswork, which are a less than adequate basis to support [plaintiff's] position—especially since performing detailed studies and tests represents the touchstone of what an engineering expert in a design defect case should do") (internal quotation marks omitted).

In sum, like Villani's opinions, Hicks's opinions do not have sufficient reliability to pass through the admissibility gateway.  Both experts' opinions should be excluded.

## C.   Summary Judgment Should Be Granted In Favor Of Sig

Having determined that Jinn's experts' opinions are inadmissible, the Court turns to Sig's motion for summary judgment.  Jinn's Complaint asserts claims for strict product liability and negligence based on both design and manufacturing defects; breach of the implied warranty of merchantability; and both negligent and intentional infliction of emotional distress.  (*See* Compl. ¶¶ 91-128.)  Without expert testimony, Jinn lacks evidence establishing that the P320 is not reasonably safe, that an alleged defect caused his accident, and that an alternative safer design was feasible.  As a result, Jinn cannot establish any of his alleged causes of action, and summary judgment should be entered in Sig's favor on all claims.  But even if the opinions of Jinn's experts were admissible, Sig would still be entitled to summary judgment because there is insufficient evidence to support critical elements of Jinn's claims.

### 1.   Products Liability And Negligence (Counts I and III)

Jinn alleges design and manufacturing defects, without differentiating between the two.  (Compl. ¶¶ 110-11, 113; Pl. 56.1 Statement at ¶ 28.)  Jinn also alleges negligence

in the design and manufacture of the P320.[32]  (Compl. ¶¶ 92-93.)  Even if his experts'
testimony were admissible, Jinn has not presented sufficient evidence to establish a claim
under any of these theories.

### a.    Design Defect, Negligent Design

Under New York law, the same elements are required to prove a strict products
liability claim premised on a design defect as a negligence claim premised on negligent
design.  *See Adams v. Genie Industries, Inc.*, 14 N.Y.3d 535, 543, 903 N.Y.S. 2d 318,
322 (2010) ("while plaintiff here has pleaded both strict liability and negligent design
causes of action, the standards set forth in [*Voss v. Black & Decker Manufacturing Co.*,
59 N.Y.2d 102, 463 N.Y.S.2d 398 (1993)] apply to both").  As the New York Court of
Appeals has explained, "the risk/utility balancing test" involved in the analysis of whether
a design is defective "is a negligence-inspired approach, since it invites the parties to
adduce proof about the manufacturer's choices and ultimately requires the fact finder to
make a judgment about the manufacturer's judgment," making a claim for products liability
based on a design defect "functionally synonymous with the earlier negligence concept

---

[32] The Complaint also alleges negligence based on failure to warn.  "While claims based
on … a lack of adequate warnings, can be framed in terms of strict liability or negligence,
failure-to-warn claims grounded in strict liability and negligence are functionally
equivalent, as … failure-to-warn claim[s] depend on the principles of reasonableness and
public policy at the heart of any traditional negligence action."  *In re New York City
Asbestos Litigation*, 27 N.Y.3d 765, 787, 37 N.Y.S. 723, 734 (2016).  "A manufacturer has
a duty to warn against latent dangers resulting from foreseeable uses of its products of
which it knew or should have known."  *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d
289, 297, 582 N.Y.S.2d 373, 376 (1992) (collecting cases).  A plaintiff also must prove
causation by proving "had a different warning been given, this [plaintiff] would not have
used the product that caused [their] injury.  *Mulhall v. Hannafin*, 45 A.D.3d 55, 60, 841
N.Y.S.2d 282, 287 (1st Dep't 2007).  Jinn has not even tried to argue the viability of a
failure to warn claim.  Jinn's experts offer no opinions about warnings, and Jinn makes
no reference to warnings in his Rule 56.1 Statement.  (Compl. ¶¶ 94, 95(v)-(vii).)  For that
reason, summary judgment is appropriate on the failure to warn claim.

of unreasonable designing." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 255-56 (1995) (internal quotation marks, brackets, and citations omitted).  The Court thus analyzes concurrently Count I of Jinn's Complaint, inasmuch as it alleges negligent design, and Count III, inasmuch as it alleges strict liability premised on a design defect.

"[T]o establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury."  *Nemes v. Dick's Sporting Goods, Inc.*, 521 F. Supp.3d 328, 336 (S.D.N.Y. 2021) (hereinafter "*Nemes II*") (quoting *Voss*, 59 N.Y.2d at 107, 463 N.Y.S.2d at 402).

A product is not reasonably safe if "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner."  *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d at 402.  A plaintiff must present evidence that the product as designed "was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner" which involves an inquiry into factors such as "(1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes."  *Nemes II*, 521 F. Supp.3d at 336 (internal quotation marks omitted).

Jinn cannot prevail on a design defect theory.  The lack of evidence regarding a safer alternative design justifies granting Sig's motion for summary judgment, regardless of whether Jinn's experts' testimony is admitted.  Neither expert, nor Jinn's counsel, discusses or presents evidence of the feasibility of an alternative design as required under New York law.  Jinn merely contends that he does not need expert testimony to establish the existence of a safer alternative design because the existence of a safer design, namely a pistol with an external safety, is "obvious and understandable" to a layperson. (Pl. SJ Mem. at 10.)  That argument is unpersuasive – firearms are not the type of product for which alternative designs are "obvious and understandable"; cases involving less technically complex products have failed for lack of expert testimony on feasible alternative designs.  *See Nemes II*, 521 F. Supp.3d at 338 (expert testimony required because "the reasonableness of a crossbow design … requires some comprehension of engineering"); *Guarascio v. Drake Associates Inc*., 582 F. Supp.2d 459, 464 (S.D.N.Y. 2008) ("The design here at issue is certainly more complex than the design of a steak sauce bottle or a ski binding, yet insufficiently probative expert testimony was fatal to design defect claims in cases involving those products") (citing *Preston v. Peter Luger Enterprises, Inc.*, 51 A.D.3d 1322, 858, N.Y.S.2d 828, 831 (3d Dep't 2008) and *D'Auguste v. Shanty Hollow Corp.,* 26 A.D.3d 403, 404, 809 N.Y.S.2d 555, 556–57 (2d Dep't 2006)).

Further, the fact that ***Jinn's employer specifically requires a pistol without an external safety*** suggests that the alternative design championed by Jinn would not be feasible due to lack of utility.[33]  (Dkt. 64-2 (DHS Solicitation HSCEMS-16-R-00003 for

---

[33] Under New York law,

contractors to provide duty pistols for U.S. Immigration and Customs Enforcement employees) at C8.)  *See Rose v. Brown & Williamson Tobacco Corp.*, 53 A.D.3d 80, 82, 855 N.Y.S.2d 119, 120-21 (2008), *aff'd sub nom. Adamo v. Brown & Williamson Tobacco Corp.*, 11 N.Y.3d 545, 972 N.Y.S. 415 (2008) ("Absent any evidence that cigarettes with the low levels of tar and nicotine advocated by plaintiffs would be acceptable in the market for the cigarettes [plaintiff] smoked, it cannot be said that plaintiffs have carried their burden of proving that it was feasible to design [he offending product in a safer manner") (internal quotation marks and brackets omitted); *compare Felix v. Akzo Nobel Coatings Inc.*, 262 A.D.2d 447, 448, 692 N.Y.S.2d 413, 414 (1999) (granting summary judgement for lack of feasible alternative design where water-based floor lacquer, presented as a proposed alternative to solvent-based lacquer, had drawbacks, such as a longer drying time, higher cost, and different finish that made it functionally different to allegedly

---

where a plaintiff claims that a product without an optional safety feature is defectively designed because the equipment was not standard[, t]he product is not defective where the evidence and reasonable inferences therefrom show that:  (1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of **the buyer's** use of the product. In such a case, the buyer, not the manufacturer, is in the superior position to make the risk-utility assessment, and a well-considered decision by the buyer to dispense with the optional safety equipment will excuse the manufacturer from liability.

*Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 661, 695 N.Y.S.2d 520, 524 (1999) (emphasis in original).  Neither party analyzes whether, in light of these factors, DHS's decision to purchase P320s without external safeties for their employees would excuse Sig Sauer's liability to Jinn.  Nonetheless, the failure of Jinn to offer **any** analysis of the addition of external safeties, or any other alternative design, is reason enough to grant Sig Sauer's motion for summary judgment in this case.

defective product), *with Andrade v. T.C. Dunham Paint Co., Inc.*, 99 A.D.3d 834, 836, 955 N.Y.S.2d 63, 65 (2012) (denying summary judgment for defendant where plaintiff presented evidence that newer water-based lacquers were accepted in the floor-finishing industry, had similar drying times, were cost-effective, and were similarly functional); *see generally Denny*, 87 N.Y.2d at 257, 639 N.Y.S.2d 250, 255 (alternative design analysis generally "demands an inquiry into such factors as … the product's … utility to the individual user").

Even considering his expert reports, Jinn has offered nothing analyzing the utility and cost tradeoffs of his favored alternative design at all.  That omission is fatal to his claims.  *See Hilaire v. DeWalt Industrial Tool Co.*, 54 F. Supp.3d 223, 252 (E.D.N.Y. 2014) (granting summary judgment for defendant because "the plaintiff must show that there was an economically and technically feasible alternative design available at the time the product was manufactured" and plaintiff failed to do so); *Maxwell v. Howmedica Osteonics Corp.,* 713 F. Supp.2d 84, 92 (N.D.N.Y. 2010) (granting summary judgment for defendant where plaintiff's expert "d[id] not address the utility of the Defendant's product or the replacement product"); *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898, 2009 WL 3334364, at *7 (E.D.N.Y. Oct. 15, 2009) (granting summary judgment for defendant where plaintiff "failed to introduce any competent evidence or analysis suggesting that [a proposed alternative design] would have been technologically or economically feasible"); *Colon*, 199 F. Supp.2d at 89 (granting summary judgment because "plaintiffs … failed to satisfy their 'obligation to present evidence that ... it was feasible to design the product in a safer manner,' by, inter alia, producing "no evidence as to what [an alternative] design would cost to produce") (quoting *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d at 208).

### b. Manufacturing Defect, Negligent Manufacture

In contrast to a design defect claim, a manufacturing defect claim "is based on an allegation that the specific product that caused plaintiff's injury was not manufactured as designed." *Tears v. Boston Scientific Corp.*, 344 F. Supp.3d 500, 510 (S.D.N.Y. 2018). "A manufacturing flaw exists when the unit in question deviates in quality and other performance standards from all of the other identical units." *Colon*, 199 F. Supp.2d at 85. A claim for products liability based on a manufacturing defect and a claim for negligent manufacturing under New York law are not literally equivalent; "[a] cause of action in strict products liability lies where a manufacturer places on the market a product which has a defect that causes injury" while "[a] cause of action in negligence will lie where it can be shown that a manufacturer was responsible for a defect that caused injury, and that the manufacturer could have foreseen the injury." *Robinson v. Reed-Prentice Division of Package Machinery Co.*, 49 N.Y.2d 471, 478-80, 49 N.Y.S.2d 717, 720-21 (1980). "Thus a manufacturer whose defective product causes injury can be held strictly liable even if not negligent, but not the reverse." *Kosmynka v. Polaris Industries, Inc.*, 462 F.3d 74, 86 (2d Cir. 2006)

"To plead and prove a manufacturing flaw under either negligence or strict liability, the plaintiff must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury." *Colon*, 199 F. Supp.2d at 85 (internal quotation marks and citation omitted). Jinn offers no evidence to establish a manufacturing defect claim under either theory. Even if Villani's and Hicks' opinions were admissible, neither compared Jinn's P320 to any others alleged not to be defective. Indeed, Jinn's entire theory is one of design defect; despite

using the words "manufacturing defect," Jinn suggests that the alleged defects in his P320 are part of a widespread problem with P320 pistols in general.  (*See* Pl. SJ Mem. at 4 (stating Hicks viewed "several other P320s that contained the same manufacturing defects, a missing safety lever return spring"[34]), 5 (P320s inspected by Villani "all possessed substantial manufacturing defects that would allow the gun to discharge without a trigger pull"); *see also* Compl. at 3-4 ("Defendant Sig, moreover, had knowledge … that the P320 … was capable of firing by itself … due to a defective firing assembly … [Sig] has recklessly failed to recall it despite knowing of many grievous wounds it has inflicted on law enforcement agents and civilians across the country").)  *See Haag v. Hyundai Motor America*, 294 F. Supp.3d 102, 105 (W.D.N.Y. 2018) ("where a plaintiff makes only conclusory references to manufacturing defects, and instead relies on allegations and/or evidence that the claimed defects are common to an entire class of [products] based on their design, rather than the result of an error in the manufacturing process, the plaintiff's claim is more appropriately characterized as a design defect claim") (internal quotation marks omitted).

Where, as here, "[a] claim [is] devoid of allegations that a particular unit differed when compared to others in the same product line [the claim] will be dismissed." *Guariglia v. Procter & Gamble Co.*, No. 15-CV-04307, 2018 WL 1335356, at *5 (E.D.N.Y. March 14, 2018).  Summary judgment in favor of Sig therefore is appropriate, regardless of the admission of the experts' testimony.  *See Tears*, 344 F. Supp.3d at 511 ("[plaintiff's] manufacturing defect claim fails because he fails to plead facts alleging that the

---

[34] To be clear, the omission of the safety return spring in several pistols is not a manufacturing oversight; according to Jinn's experts, Sig made the decision to remove the spring from the P320's design.  (Villani Supp. Rep. at 3; Hicks Rep. at 7.)

Greenfield Filter with which he was implanted is defective as compared to other Greenfield Filters"); *Cowan v. Costco Wholesale Corp.*, No. 15-CV-05552, 2017 WL 59080, at *4 (E.D.N.Y. Jan. 5, 2017) ("Plaintiff fails to plead a manufacturing defect claim adequately because her Amended Complaint is devoid of any allegation that the Product had a manufacturing defect when compared to other 'PAM' cooking sprays in the market").

### c. Lack Of Expert Testimony Establishing Defects And Causation Warrants Summary Judgment On All Products Claims

The exclusion of the experts' testimony identifying defects and asserting causation also supports granting summary judgment for Sig. "With [the experts'] testimony properly excluded, the record is devoid of any evidence supporting [Jinn's] theory that the [P320] had a design defect or that such a design defect likely caused his accident."[35] *Valente v.*

---

[35] Under New York law, "[a] plaintiff who cannot prove a specific design or manufacturing defect through expert testimony or other direct evidence may [ ] prevail on the basis of circumstantial evidence alone" under certain circumstances. *Zsa Zsa Jewels*, 419 F. Supp.3d at 509. Without evidence of a specific defect, "a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 125 (2d Cir. 2006), *aff'd*, 552 U.S. 312, 128 S. Ct. 999 (2008); *accord Bozick v. Conagra Foods, Inc.*, No. 19-CV-4045, 2022 WL 4561779, at *32 (S.D.N.Y. Sept. 28, 2022). On summary judgment, "the plaintiff must first establish that the injury was of a kind that ordinarily occurs as a result of a product defect, which may be inferred where the product did not perform as intended." *Zsa Zsa Jewels*, 419 F. Supp.3d at 510 (internal quotation marks and citations omitted). The burden then shifts to the defendant to "propose an alternative explanation for the harm, one that does not implicate a product defect," *id.* at 511, then returns to plaintiff to "present[] competent evidence rebutting [defendant's] alleged other causes for the incident sufficient to create an issue for trial." *Bozick*, 2022 WL 4561779, at *34 (internal quotation marks omitted). That said, Jinn makes no attempt to argue that he could prevail on his products liability claims based purely on circumstantial evidence without expert testimony. On the contrary, on the issue of whether "Jinn has advanced sufficient evidence for a rational jury to conclude that his P320 discharged without a trigger pull," Jinn "incorporates by reference" his brief opposing Sig's *Daubert* motions. (Pl. SJ Mem. at 9.)

*Textron, Inc.*, 559 F. App'x 11, 14 (2d Cir. 2014); *accord Amorgianos*, 303 F.3d at 271 (2d Cir. 2002) ("In the absence of any expert evidence as to general causation … defendant was entitled to summary judgment because of plaintiffs' failure to present any admissible evidence in support of their theory of causation").[36]

### 2.    Breach Of Implied Warranty Of Merchantability (Count II)

"Where a plaintiff fails to submit anything in opposition to summary judgment establishing separate factual bases for their breach of implied warranty of merchantability claims and the strict products liability claim based on defective design," the implied warranty claim fails alongside the design defect claim." *Nemes II*, 521 F. Supp.3d at 346 (internal quotation marks and citations omitted).  Jinn does not differentiate between the factual bases for any of his claims in his opposition to summary judgment.  Thus, for the same reasons that Sig is entitled to summary judgment on Jinn's the products liability claims, Sig is entitled to summary judgment in its favor on Jinn's claim for breach of implied warranty of merchantability claim as set forth in Count II of the Complaint.

---

[36] This conclusion is equally applicable to Jinn's undeveloped failure to warn theory – without admissible evidence establishing that his P320 could have fired without something pulling the trigger, Jinn cannot prove his injury was caused by a lack of warning that such an un-commanded firing could occur.   In *In re Mirena IUD Products Liability Litigation*, 202 F. Supp.3d 304 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017), "Plaintiffs … argue[d] that the [warning] label is inadequate because it did not warn of perforation unrelated to insertion, which they must show exists as a phenomenon in order to prove general causation and prevail."  202 F. Supp.3d. at 309.  The Court granted summary judgment for the defendant after excluding the testimony of the plaintiffs' experts because plaintiff had no expert testimony to establish this phenomenon, and so no evidence that the product could have injured them in the way alleged.  *Id.*, at 311-12. So too here, because Jinn has no evidence to establish that his P320 could have discharged without a trigger pull, summary judgment is appropriate on the claims premised on Sig's failure to warn about such a phenomenon.

### 3.   Negligent And Intentional Infliction Of Emotional Distress (Counts IV and V)

Jinn's final two causes of action of his Complaint are for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED").  Under New York law, "a plaintiff has a cause of action for negligent infliction of emotional distress if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety … The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (internal quotation marks and citations omitted).  A claim for IIED under New York law requires a plaintiff to demonstrate "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121 596 N.Y.S.2d 350, 353 (1993)).  "New York courts have imposed a very high threshold for intentional infliction of emotional distress claims, requiring that the conduct must be so outrageous and extreme 'as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Campoverde v. Sony Pictures Entertainment,* No. 01-CV-7775, 2002 WL 31163804, at *11 (S.D.N.Y. Sept. 30, 2002) (quoting *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983)).

A claim for emotional distress "generally is not allowed if it is essentially duplicative of tort or contract causes of action." *Djangmah v. Falcione*, No. 08-CV-4027, 2013 WL 208914, at *9 (S.D.N.Y. Jan. 18, 2013), *R. & R. adopted*, 2013 WL 1195261 (S.D.N.Y. March 25, 2013) (internal quotation marks omitted).  That is the case here.  Jinn's NIED

and IIED claims "seek[] damages for the same circumstances and injuries, physical and emotional, that his tort claims seek." *Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-CV-0209, 2022 WL 4357555 at *29 (E.D.N.Y. Sept. 20, 2022). And, "potentially having designed, manufactured, or failed to warn of defects in a product, also does not rise to the 'outrageous' conduct or indecent behavior that a claim of NIED [or IIED] requires." *Id*.; *accord Scism v. Ethicon, Inc.*, No. 1:19-CV-1543, 2020 WL 1245349, at *7 (N.D.N.Y. March 16, 2020) (dismissing NIED claim that "relie[d] on allegations that defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed, and sold" a defective product as duplicative of products liability claims) (internal quotation marks omitted).  Accordingly, Sig is entitled to summary judgment in its favor on Claims IV and V of the Complaint.

**D.      Plaintiff's Motion To Introduce A New Video Exhibit Should Be Denied**

Because the Court recommends granting summary judgment for Sig based on Jinn's lack of critical evidence, Plaintiff's later-filed motion to introduce an additional video exhibit should be denied as moot.  Jinn describes the video as "a surveillance recording of a P320 discharging inside an officer's holster … on February 7, 2022" which "Jinn contends … is another substantially similar incident of a triggerless discharge of a P320 from which a rational jury should be allowed to weigh and could reasonably infer from it and others that Jinn's P320 was similarly defective."  (Dkt. 70.)

Whether admitted or not, the video would have no effect on the Court's ultimate conclusion that Sig is entitled to summary judgment.  Jinn does not disclose any additional details of the circumstances surrounding this alleged triggerless discharge.  Sig represents that the video depicts "an officer exiting a vehicle with what is assumed to be

a holstered pistol on his hip (though it is impossible to tell from the video, which does not actually show the pistol)," which, as discussed in the context of other videos proffered by Jinn, is a quite different scenario than Jinn pulling his pistol out of its holster in a first-to-draw-and-shoot contest.  (Dkt. 71 at 1.)  Moreover, as described, the video does not allow a viewer to discern critical information about the condition of the pistol or whether another object entered the holster and engaged the trigger.  (*See* Dkt. 71.)

       The motion should alternatively be denied on the merits.  Evidence submitted on summary judgment must be admissible.  *See, e.g., eCommission Solutions, LLC v. CTS Holdings Inc.*, 860 F. App'x 758, 760-61 (2d Cir. 2019) (summary order); *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  In order for evidence to be admissible, it must be authenticated.  Fed. R. Evid. 901.  The requirement for authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  "[I]f sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification," evidence should be admitted.  *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir.2004) (internal quotation marks omitted).

       Fed. R. Evid. 901(b) lists various examples of authenticating evidence.  Jinn, however, offers nothing in its letter motion to authenticate the video except for counsel's unsworn say-so, which is patently insufficient.  See *Leo v. Long Island Railroad Co.*, 307 F.R.D. 314, 324 (S.D.N.Y. 2015) ("The admitting party's burden of making a prima facie showing that the item is genuine can be satisfied in several ways, including the testimony of a witness with knowledge … For video recordings, like tape recordings, the proponent

should also show that the camera functioned properly, the operator was competent in operating the equipment, and the recording accurately represented the scene depicted") (internal quotation marks and citations omitted); *United States v. Ida*, No. 96-CR-430, 1997 WL 122753, *2 (S.D.N.Y. March 18, 1997) ("In view of the strong impact that [video] recorded evidence may have on juries ... the Second Circuit requires that [proponent] produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings").  Plaintiff's failure to authenticate the video under the Federal Rules of Evidence is reason enough to deny his motion.

To be sure, experts may rely on evidence that is not admissible.  Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted").  That exception does not apply, however, because neither of Jinn's experts considered the additional video in forming their opinions.  Nor could they have, as the incident depicted occurred well after their reports were submitted in this case, and Jinn has not tendered any supplemental reports from either Villani or Hicks.

## CONCLUSION

As is evident from some of the caselaw cited above, the instant case is not the first to claim negligent design of the Sig Sauer P320; nor is it the first to grant summary judgment in favor of Sig.  Whether another case may culminate in a finding of liability is not a question for this Court.  In the instant case, however, Plaintiff has failed to provide the proof necessary to proceed beyond summary judgment.

For the foregoing reasons, I recommend that Defendant's motions to exclude and for summary judgment be GRANTED and that Plaintiff's motion to admit a new video

exhibit be DENIED.  To the extent not discussed herein, the Court has considered all of Plaintiff's arguments and determined them to be without merit.

## DEADLINE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Paul G. Gardephe, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007.  **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: April 12, 2023
        New York, New York

Copies transmitted to all counsel of record.